GEORGE RIKER, Plaintiff, *v.* CITY OF NEW YORK, Defendant.

Supreme Court, Trial Term, New York County, November 24, 1953.

■■■■■■

*Joseph La Gattuta, Harry H. Lipsig* and *Joseph N. Friedman* for plaintiff.

*Denis M. Hurley, Corporation Counsel (Abraham B. Silver* of counsel), for defendant.

FRANK, J.   In the early hours of September 4, 1948, one Guillermo Lazu was seated in a restaurant at 60 East 110th Street, borough of Manhattan, city of New York.   He was slaking his thirst with a few bottles of beer to the accompaniment of soft musical strains emanating from a mechanical record player, when the peace of his snug retreat was disturbed by the entrance of a group of men, variously estimated as from six to ten in number.   After several rounds of beer, these men shut off the juke box every time Lazu attempted to continue its operation.   The language became heated and the proprietor, to avoid violence, ordered the rowdies to leave the store.   They complied, but congregated on the street in front of the restaurant.   From there the men, in idiom vituperative and obscene, taunted Lazu, challenged him to come into the street, threatened him, and warned the proprietor that a call to the police for help would inspire them to reduce his establishment to rubble.

Edward Lawrence, a police officer only two years on the force, while checking into the station house by police phone, was attracted to the scene by the sound and fury, although the foreign language used was unintelligible to him.   His purposeful approach caused the group to dissolve and disappear into the hallways of buildings on both sides of the street.   While he inquired the cause of the commotion, a bottle landed on the sidewalk at his feet, shattering into myriads of fragments.   The officer scanned the roof tops of the houses across the street.   It was evident that the bottle had been flung from one of them and he assumed that more of these missiles or of a deadlier variety would likely follow.   Lawrence spied George Riker, a duly licensed private detective, just then on his rounds inspecting stores on the opposite side of the street.   He shouted, " Hey,

George, come over here and help me. Get your gun out while you're at it."

Riker obeyed as commanded. He proceeded to the south side of East 110th Street, unholstering his revolver as he crossed the roadway. When he reached the sidewalk, Lawrence instructed him as to their joint action designed to apprehend those responsible for violating the public peace.

As these directions were being given to Riker, a shower of red housebricks descended upon them. One brick struck the sidewalk a foot or two away from Lawrence. Another struck Riker on the right forearm and fractured the radius. The plaintiff seeks recovery for this serious injury which has permanently incapacitated him.

Counsel have been unable to submit and research has failed to disclose a reported case in this State precisely in point. Two sections of the Penal Law require consideration: section 1848, upon which plaintiff predicates his action; and section 2095, urged by the defendant as applicable to the facts.

Long before police and peace officers formed the base for law enforcement, long before the ancient office of sheriff as an enforcement agency was known, there was imposed upon lord and liege the duty to maintain public peace and safety and to apprehend the violators thereof. This system of law enforcement was known before the Saxon conquest of England in 449 A. D. and became firmly established in Anglo-Saxon law at the time of the Norman conquest. It was the genesis of the ancient English law of the hue and cry.

To compel this public service, subjects were required, in accordance with their means, to possess " an hauberke, a breast-plate of iron, a sword and an horse " or " bows, arrows, knives that they are bound to keep and, besides much shouting, there will be horn-blowing; the ' hue ' will be ' horned ' from vill to vill." (Pollock and Maitland on History of English Law [2d ed.], Vol. II, p. 579.) When the call was given (hue and cry), the inhabitants of the county, hundreds, or tithings were required to respond. Failure to apprehend the perpetrator and retrieve the stolen property gave rise to an action by the victim to recover for his loss against the community involved (Statute of Winchester [1285]; 13 Edw. 1, st. 2, ch. 1; 28 Edw. 3, ch. 11 [1584-5]; 27 Eliz. ch. 13 [1734-5]; 8 Geo. 2, ch. 16; 9 Halsbury on Laws of England [2d ed.], note p. 89).

With the passing of the centuries, as law enforcement agencies developed, the statutes saddling the burden upon the general public were correspondingly repealed.

One salient element of these primitive procedures was never abandoned. The basic concept that every subject or citizen can be required to assist in the pursuit and apprehension of perpetrators or suspects of crime remains firmly fixed in the common law of the several States as well as in the British Commonwealth. Moreover, such specific provision is made in the Criminal Codes of most, if not all of the States in the Union. The required response to an order for assistance is not a voluntary act, albeit there is willingness to comply. The person upon whom demand for aid is made has no right to arbitrarily refuse. As expressed by the highest court of a sister State, in a case seeking the conviction of one for willful refusal to aid an officer, under a statute similar to ours; the command must be obeyed, else the penalty for willful avoidance be imposed: '' To the person summoned by a lawful officer to come to his aid in making an arrest it is absolutely immaterial and irrelevant what is the name of the party to be arrested or the nature of the offense. ' It is not for him to ask the reason why.' It is his duty as a good citizen, and in obedience to the authority of the state as represented by a lawful officer, to aid in the arrest. Upon the special verdict the defendant should have been adjudged guilty.'' (*State* v. *Ditmore,* 177 N. C. 592.)

In affirming an award under the Workmen's Compensation Law (*Matter of Babington* v. *Yellow Taxi Corp.,* 250 N. Y. 14, 17) Chief Justice CARDOZO, writing for the majority of the Court of Appeals, in discussing section 1848 of the Penal Law, lucidly stated: '' The ancient ordinance abides as an interpreter of present duty. Still as in the days of Edward I, the citizenry may be called upon to enforce the justice of the State, not faintly and with lagging steps, but honestly and bravely and with whatever implements and facilities are convenient and at hand.''

Whether the imposition of the duty under the common law coupled with the waiver of sovereign immunity under section 8 of the Court of Claims Act, confers a right of recovery in the absence of specific statutory provision therefor is not, however, here involved. The legislative fiat contained in section 1848 of the Penal Law, adequately encompasses the factual proof established at this trial. The pertinent portions of the section read as follows: '' A person, who, after having been lawfully commanded to aid an officer in arresting any person * * * or in executing any legal process, wilfully neglects or refuses to aid such officer is guilty of a misdemeanor. Where such a command is obeyed and the person obeying it is * * * injured * * * and such * * * injury * * * arises out of

and in the course of aiding an officer in arresting or endeavoring to arrest a person * * * or endeavoring to execute any legal process, the person * * * so injured * * * shall have a cause of action to recover the amount of such damage or injury against the municipal corporation by which such officer is employed at the time such command is obeyed."

The defendant City of New York contends that the above-quoted section has no applicability here. The municipality urges that only section 2095 of the Penal Law, can be related to the factual situation present. That section follows: " 2095. *Refusing to assist in arresting rioter.* A person, present at the place of unlawful assembly or riot, who, being commanded by a duly authorized public officer to act or aid in suppressing the riot, or in protecting persons or property, or in arresting a person guilty of or charged with participating in the unlawful assembly or riot, neglects or refuses to obey such command, is guilty of a misdemeanor."

It will be noted that this section does not contain the additional verbiage, as in section 1848, imposing municipal liability for injury received by one who complies with a command for assistance. The defendant contends that this was a riot and an unlawful assembly and the plaintiff, therefore, may not seek compensation for his injury.

It is found that no riot or unlawful assembly was in progress or in existence at the time the injury was inflicted upon Riker. From the testimony of officer Lawrence, a witness called by the defendant, it appears uncontradicted that no riot was in progress at any time and that the assembly of men, whether unlawful or not, terminated before the arrival of the plaintiff. It is patent, from the proof, that the officer sought the plaintiff's assistance in order to apprehend one or more persons responsible for throwing the bottle and thus attempting to commit an assault

Section 1848 of the Penal Law derives from the Revised Statutes of 1867 (Edmonds ed., Vol. 2, p. 771, art. 3, § 2₅). Incorporated in the Penal Code of 1881 as section 121 it was designated by its present enumeration upon the adoption of the Penal Law in 1909 (L. 1909, chs. 40, 88). In 1932 (ch. 480) there was added to the section, with a heading " An Act to amend the penal law, in relation to injuries sustained while assisting an officer " the provision hereinbefore partially quoted. By this codification the liability of the municipality is immutably fixed.

No precise words of command are required so long as the direction for assistance, as here, is evident from the language employed (*State* v. *Bertchey,* 77 N. J. L. 640; *Cornett* v. *Com-*

*monwealth,* 198 Ky. 236; *McMahan* v. *Green,* 34 Vt. 69). The injury that plaintiff suffered resulted from his response to the command of officer Lawrence and causal relationship was clearly established. It is therefore determined as a matter of law and fact that plaintiff have recovery for his injuries.

Plaintiff sustained a fracture of the radius of the right arm. He was taken to Flower Hospital, where he was given some temporary emergency treatment and sent home. The next morning, at the Hospital for Joint Diseases, a closed reduction was attempted, which subsequently proved unsuccessful, a cast applied, and X rays taken. Thereafter, Riker was admitted to Prospect Hospital and an open reduction operation was performed. Marked displacement of the fragments made it necessary to insert a three-inch Lee Plate fastened to the fragments of bone by means of four screws, in an effort to obtain union and proper alignment. X rays taken September 18, 1953, five years after the accident, revealed the fracture line still visible, indicating that union of the bone was incomplete.

All the medical testimony agrees that there is permanent loss of use. There is disagreement only as to the extent, which varies from 15% to 45%. Riker was thirty-eight years old at the time of the occurrence. He cannot fully perform the work required of him as a licensed private detective. Acting upon medical advice, he has not attempted to use a firearm, lest the recoil cause a refracture of his arm. He cannot undertake to perform that part of his duties which would require either facility with a revolver or the use of physical force. The plaintiff had a life expectancy of twenty-nine years when injured. Special damages approximated $1,000. The clerk is directed to enter judgment in favor of the plaintiff in the sum of $22,000. This constitutes the decision of the court pursuant to section 440 of the Civil Practice Act.