Irving H. Saypol, J.
The plaintiff sued the City of New York and Cornelius Flynn for false arrest, negligence and assault and battery claiming punitive damages against the individual defendant. In the course of the trial decision was reserved on the city’s motions to dismiss as to it at the close of the plaintiff’s evidence and after all the evidence. A verdict was directed against Flynn for the false arrest and the assault and battery. The case was submitted to the jury for its separate verdicts as to the negligence of both defendants and on the other counts as to the city. Alternate forms of verdicts for related causes and with respect to damages were instructed to the jury. Despite clear and precise instructions as to the form of these possible alternatives, the jury brought in a general verdict for $50,000 against both defendants. Flynn’s motions addressed to the verdict were denied. The city moved before the discharge of the jury to set it aside as against the weight of evidence (Civ. Prac. Act, § 549). After the jury’s discharge the city moved against the verdict because of the *124 jury’s evident disregard of the court’s instruction for separate verdicts. The questions for decision then are on the city’s motion to annul the verdict as against the weight of the evidence or for its impropriety and to order a new trial (Civ. Prae. Act, § 549), to dismiss the complaint for lack of a prima facie case as the city now argues in its brief, or to set the verdict aside and to direct a verdict for the city non obstante veredicto and for judgment of dismissal for insufficiency of evidence (Civ. Prac. Act, § 457-a). In the latter aspect, even though the defendant may not have so moved, decision having been expressly reserved on appropriate motions, the court of its own motion is expressly empowered to reconsider and to rule in the premises. In the over-all picture although the power should be exercised with caution (Algeo v. Duncan, 39 N. Y. 313, 316) its action, having supervised the trial, as a proper exercise of discretion, will not be disturbed (Kligman v. City of New York, 281 App. Div. 93).
The undisputed facts as developed on the trial show that the plaintiff was an innocent patron in a Bronx restaurant about 6:30 a.m. on April 15, 1953. The defendant Flynn who did not take the stand entered with his acquaintance Nelson. Others were there as patrons, including the plaintiff’s witnesses McMillan and Feaster. Nelson, a mechanic, formerly a New York City policeman who had been dismissed for failure to disclose a criminal record, said he and Flynn had renewed an old acquaintance in a tavern around midnight. They had not seen each other for two years. When Flynn, evidently in a happy mood, proclaimed that he had that day “ signed the book” that meant that he had successfully completed a probationary six months’ period and was now a full-fledged New York City patrolman in its police department. • Nelson thereupon confided to Flynn that he had knowledge, quite plainly stale and flimsy, of violations of those laws pertaining to illicit trafficking in narcotics. He volunteered to Flynn the suggestion that they go forth at once to ferret and pursue his leads toward the end that if successful it would lead to official recognition and advancement for Flynn in the police department. Flynn agreed and they set out on what turned out to be an all-night crusade mostly in saloons and taverns (but evidently fruitless and profitless although they did drink some beer and ale) until they reached Freddie’s Diner at 168th Street and Boston Road about 6:00 a.m. It should be noted at this point that Nelson’s testimony of their conversation, on the city’s objection, was received against Flynn alone. Continuing, Freddie’s was a place on Nelson’s list of suspected premises because two years before *125 his brother-in-law, also a policeman who lived nearby, cautioned him to avoid it because it was frequented by questionable characters. This Nelson confided to Flynn, whereupon they entered to look around. Here there is inconsistency in the plaintiff’s story. Nelson testified that on entering he left Flynn at the counter and went to a telephone booth some distance away intending to telephone to his home explaining his all-night stay out, and while so engaged he heard Flynn announce “I am a policeman ” followed by a pistol shot which proved to be the plaintiff’s undoing and misfortune. Not only was Nelson uncorroborated but in fact the plaintiff and his two other witnesses contradicted his story. McMillan and Feaster testified that they and the principals were never more than four to five feet from each other and that Flynn without prior announcement or ceremony began with pistol in hand to poke about Burns’ person, in what was described as a search, of which Burns protested. Regarding this, both McMillan and Feaster testified that Nelson then admonished Flynn to “leave him alone he is not doing anything ” and then it was that Burns was shot and wounded and permanently crippled as the jury may well have concluded in view of the amount of the verdict. Both witnesses denied that Flynn at any time announced himself as a policeman and they both contradicted Nelson’s testimony that he was in a telephone booth when the shooting occurred. McMillan also described Flynn’s conduct as carried on while he swayed to and fro, perhaps in a drunken stupor. The other pertinent and uncontradicted evidence in the case which the jury could properly have found established that Flynn had completed his assigned tour of duty the day before, not to resume until the day following the shooting; that the occurrence was outside the boundaries of Flynn’s assigned precinct and finally the judicially recognized rules and regulations and provisions from the Manual of Procedure of the Police Department of the City of New York providing that the police department and the police force have the power and it is their duty at all times of the day and night to protect life and property, prevent crime, detect and arrest offenders, preserve the public peace and enforce all laws (reg. 6), requiring members of the force to remain fit for and subject to duty at all times (reg. 175) and mandating the carrying of prescribed types of firearms at all times whether on or off duty (reg. 281). There were also read in evidence provisions from the Manual of Procedure applicable to members of the police force like Flynn on receiving information of narcotic law breaches together with the testimony of Flynn’s superior officer, the over-all conclu *126 sion therefrom being that Flynn would not be authorized to take police action on such information but rather that his official duty would be to pass it along to designated superiors for reference to specially assigned members of the narcotics branch of the department.
The immediate question involved in the city’s motions narrows itself at once to an interpretation and application of the doctrine of respondeat superior on the facts of the case. It is a question of whether or not the shooting occurred within the scope of Flynn’s employment as a patrolman of the police department of the City of New York. This is so even though the city, in its brief, puts the question in these alternatives: that the verdict was improper for as a single verdict it reflects the likelihood of duplication, viz., the coupling of the false arrest and assault counts with the negligence count and also the probability of the imposition of punitive damages against the city, although unsupported by the record; that the verdict was excessive and that it was contrary to the evidence. It is argued further that directing a verdict against the individual defendant on the counts - other than negligence may have borne heavily against the defendant city. And finally, it is urged that the complaint should be dismissed for failure to make out a prima facie case — as to which I have already said that my decision was expressly reserved.
The plaintiff, in its brief urging that the motions be denied and the verdict allowed to stand, tries to meet the dominant issue with citation of authorities which are either inept or have been misconstrued.
Reiteration of the recent principles recognizing a municipality’s liability for the misconduct of its servants is unnecessary (Bernardine v. City of New York, 294 N. Y. 361). Misconduct of policemen in the performance of their duties or even when off duty where propensity for misconduct was known to the city established a basis for recovery (McCrink v. City of New York, 296 N. Y. 99; Brown v. City of New York, 279 App. Div. 741; Riker v. City of New York, 204 Misc. 878). On the other hand, misdeeds by policemen, with their firearms, producing injury but not in the line of police duty will not fasten liability on the city. (Pacheco v. City of New York, 11 Misc 2d 80, affd. 285 App. Div. 1031).
What constitutes conduct that will impose liability against the city for the misdeeds of its policemen when off duty should be considered against the background of the facts in Brown (supra) as contrasted with those in Pacheco (supra) controlled by the decision of the Court of Appeals in Sauter v. New York *127 Tribune (305 N. Y. 442). In the latter case there had been a collision between an omnibus operated by the plaintiff and a newspaper delivery truck operated by the defendant’s chauffeur. The efforts of the plaintiff to exchange credentials resulted in a fracas in the course of which he received a punch to the jaw from the defendant’s chauffeur. Withholding retaliation, the plaintiff instead knelt under the tailgate of the defendant’s truck to copy its registration number, whereupon he was brutally kicked in the face as he so knelt. It was the plaintiff’s contention, accepted in the lower courts, that the assault occurred as an incident of the master’s business, the operation of its truck concomitantly requiring the exchange of registration and licensing information in the event of accident. The majority of the Court of Appeals disagreed and reversed, holding that the second battery was not in the work of the employer.
Relevant to this subject is the quotation of Lord Kenyon’s earlier rule quoted in Wright v. Wilcox (19 Wend. 343), quoted again in Isaacs v. Third Ave. R. Rr. Co. (47 N. Y. 122) that “when a servant quits sight of the object for which he is employed, and, without having in view his master’s orders, pursues that which his own malice suggests, he no longer acts in pursuance of the authority given him.” An evolutionary exposition of the rule may be found in Sealy on Torts (§§ 54-57).
In volume 57 of Corpus Juris Secundum (Master and Servant, § 570, subd. b) it is stated that expressions said to be equivalent to “scope of employment” are “line of duty” (although it has been stated that there is a clear distinction between the two expressions), “ course of service,” “ employer’s service,” “furtherance of employer’s business,” “prosecution of the master’s business,” “protection of the employer’s property,” and the like.
Considering the nature of the policeman’s job and his obligations and those of the department of which he is a member as can be gleaned from the pertinent regulations of the department, it is expected by the employer that he is to be fit always and armed at all times subject to respond to any call to discharge their prescribed obligations. That means that when he is performing an assigned tour of duty and also when on his own and offtime, to enforce the law and preserve the peace.
It follows in logic that to fasten liability on the city the action of the policeman must have been ‘ ‘ in line of duty ’ ’ in order to be brought within the “ scope of employment.” Patently, that is not the same thing as saying that any and all members of the police force are on duty 24 hours a day, as *128 plaintiff’s counsel argued on summation; that all members of the force are authorized and permitted, unrestrained, without supervision, to function as vigilantes seeking out for whatever purpose whimsical though it may be, for acclaim or advancement, without prior evidence or even on suspicion of the likelihood of any and all kinds of violations of the criminal statutes. The implications of such uncontrolled police activities in the city of New York by members of a force of over 20,000 men, ungeneralled and undisciplined as they would be, are beyond comprehension. The potential anarchy rebuts the contention. The answer is self-evident. It could not be tolerated .
Dean Young B. Smith (23 Col. L. Rev. 441, 716 “ Frolic and Detour ”), quotes Baron Parke in Joel v. Morison (6 C. & P. 501, 503) that the master is not responsible for injuries caused to others by his servant’s unauthorized negligence while “on a frolic of his own ”. The city, as master, when its policeman servant “ quits sight of the object for which he is employed ” “ and pursues that which his own malice suggests ” (Wright v. Wilcox, supra, p. 347), and after an all-night frolic shoots an innocent person in a setting in which there is absolutely no evidence of crime, no evidence of any kind of the need for action to preserve the peace, in fact, no need of any kind of police intervention, should not be held accountable for that frolic.
Paraphrasing the opinion in Kantor v. City of New York (251 App. Div. 454-456), the defendant city, in establishing and maintaining a police force for the protection of its people, is not to be expected either in reason or on authority to maintain personal control of each member of its police force in his off-time against the unforeseeable contingency that he may go berserk. The difference between Brown (279 App. Div. 741, supra) and Pacheco (285 App. Div. 1031, supra) is apparent. In Brown (supra) two off-duty policemen were accused of assault and battery of the plaintiff. The case went to the jury on the issue of fact raised by the policemen defendants who testified that they had heard a woman’s anguished scream and responding thereto their suspicions were drawn to the plaintiff, with the consequences that followed. The direct question there was the propriety of the police action. There was no question of respondeat superior. In fact, in the plaintiff-respondent’s brief in that record on appeal it is stated that respondeat superior was not raised. Pacheco (supra) on the other hand, dealt mainly with that point. In that case there was a directed verdict for the city at the close of all the evidence. Pacheco had testified that about midnight, in a tavern at its bar, he was *129 accosted by two strangers whom he had overhead speaking to the bartender about counterfeit money; that one of the strangers had addressed Pacheco, identifying himself as a New York City detective, confirming it by allowing Pacheco to feel his pistol, and that the other stranger had been described as a secret service agent. Thereafter he had been kept in their custody, escorted to another tavern on a dubious quest, and finally, after several hours, he had been shot and crippled by the detective. The directed verdict for the defendant was affirmed. (Pacheco v. City of New York, supra.)
In the case at bar the connection of the defendant Flynn as a policeman of the city in line of duty as distinguished from defendant Flynn on his own frolic depends on the disputed narrative of his companion Nelson, the dismissed policeman. According to provisions of law which were charged to the jury (Code Crim. Pro., §§ 177-185) Flynn’s conduct in the circumstances, whether as peace officer or private citizen, was illegal. There was not the slightest basis in fact and law for his conduct in entering the premises for the purpose stated by Nelson.
Giving the plaintiff the benefit of the most favorable intendment of his evidence, in that aspect of the case to be viewed before rather than after verdict, leaves it, as the very most, doubtful whether Flynn in fact said, before the shooting * ‘ I am a policeman ”, as Nelson testified, rather than as testified by the other two plaintiff’s witnesses that Nelson said “ Why don’t you leave him alone. He’s not doing anything.” The plaintiff’s version, too, contradicted Nelson’s testimony regarding the announcement by Flynn that he was a policeman. But even if Nelson’s version be taken against that of the other witnesses, the background of their all-night activities must be deemed highly improbable and in no event, even if true, legally sufficient to put Flynn in the area of performance of his employer’s business. In the verdict of the jury against the City of New York there is necessarily implicit such a finding that Flynn’s conduct was within the scope of his employment and in the line of his duty. True it is that literally there is Nelson’s testimony to support this, a possibility but not a probability, it is incredible, and accordingly'in law there is no such evidence reasonably to support the jury’s finding. That testimony which was proffered lacks the substance which is required reasonably to support the finding. There is no evidence to support an inference that Flynn was performing duty for the defendant City of New York at the time he shot Burns. (Blum v. Fresh Grown Preserve Corp., 292 N. Y. 241; Matter of Case, 214 N. Y. 199, 203; Jewell v. Parr, 13 C. B. 916.)
*130 Decision having been reserved on the motions of the defendant City of New York to dismiss at the close of plaintiff’s case and after all the evidence, on reconsideration and upon the Judge’s minutes the motion to dismiss at the close of all the evidence is granted, the verdict is vacated and set aside and judgment, non obstante veredicto, directed for the defendant City of New York dismissing the complaint.