VAL LORRIE GLOVER, Adm'r of the Estate of Gertrude Wilson, Deceased, Plaintiff-Appellant and Cross-Appellee, *v.* THE CITY OF CHICAGO *et al.,* Defendants-Appellees and Cross-Appellants.

First District (3rd Division)    No. 79-703

Opinion filed May 19, 1982.

. Herbert F. Stride, Ltd., and .William J. Harte, Ltd., both of Chicago, for appellant.

Stanley Garber, Corporation Counsel, of Chicago (Robert R. Retke and Maureen J. Kelly, Assistant Corporation Counsel, of counsel), for appellees.

JUSTICE McGILLICUDDY delivered the opinion of the court:
The plaintiff, Val Lorrie Glover, the administrator of the estate of

Gertrude Wilson, filed a four-count amended complaint against the city of Chicago and police officers Daniel Fitzgerald and Thomas Ferry. The complaint sought to recover damages for loss of support, pain and suffering, lost wages and burial expenses that resulted from the shooting death of Gertrude Wilson. Counts I and II based recovery on the absolute liability provisions of section 1—4—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 1—4—5). Recovery under count III was based on alleged negligence and indemnification liability pursuant to section 1—4—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 1—4—5), and recovery under count IV was based on alleged wilful and wanton conduct.

At the close of the plaintiff's case, the defendants asked for directed verdicts on all counts. The trial court directed verdicts for the city and Ferry on all counts and directed verdicts for Fitzgerald on counts I, II and IV. A verdict was directed in favor of the plaintiff against Fitzgerald on count III, and the jury awarded damages in the amount of $20,000 on that count. The plaintiff filed a post-trial motion seeking judgment against all the defendants and a new trial on the damages issue or a new trial on all the issues against all the defendants. The trial court ordered a new trial against all the defendants on all of the issues. Leave to appeal was granted by this court pursuant to Supreme Court Rule 306 (73 Ill. 2d R. 306).

The issues presented on appeal are whether the trial court erred in setting aside its directed verdicts and the jury award and ordering a new trial on all of the issues.

At trial Officer Fitzgerald testified as an adverse witness and stated that he met the decedent in March 1972 when they appeared before a judge to obtain a felony warrant against her ex-husband, Albert Winston. Fitzgerald spoke to the decedent several times during the following year and told her to call him if she knew Albert's whereabouts. On April 12, 1973, at about 5 p.m., the decedent called Fitzgerald to advise him that Albert was in the area and would be at her apartment at about 7 p.m. Fitzgerald arranged to call her at about 7 p.m. and was informed during this second conversation that Albert had a gun.

When Officer Fitzgerald proceeded to the decedent's apartment, he called for assistance and was met by Officers Ferry and DiGiacomo. The decedent's apartment could not be located so Fitzgerald called her for additional directions. She told him that her aunt would direct them to the apartment. After receiving directions from the decedent's aunt, the three officers walked in single file toward the outside stairway leading to the decedent's two-story apartment. Fitzgerald was in the lead, and Ferry and DiGiacomo followed. Fitzgerald had his gun drawn.

Officer Fitzgerald stated that as he approached the stairs, he was

fearful of being hurt since Albert Winston had a gun. When Fitzgerald reached the stairs, he saw a man wearing a light-colored t-shirt in a second-floor window. Fitzgerald testified that he then heard gunfire and saw two or three flashes of light, that he assumed was gunpowder burning from a discharged gun, emanate from the second-floor window. When Officer DiGiacomo fell to the ground with a bullet wound in the chest, Fitzgerald believed they were being fired upon and jumped back. He aimed his gun toward the figure that had disappeared from the window and yelled, "Winston, you're under arrest, come on out." The door to the decedent's apartment opened about a foot and one-half to two feet, and Fitzgerald saw the man in the light-colored t-shirt. The man slammed the door and opened it a few seconds later. Fitzgerald saw a hand come out of the door, assumed the man was going to draw a weapon and then fired his gun twice at the man in the door. When Fitzgerald fired his weapon, he believed the decedent's children were present in the apartment.

Upon entering the apartment, Fitzgerald saw the decedent lying on the kitchen floor dressed in red pants and a black sweater. She had been shot by a bullet fired from Fitzgerald's gun. No weapons were found in the decedent's apartment, and there was no evidence to indicate that a weapon had been fired on the premises. Fitzgerald was informed later that the bullet that injured Officer DiGiacomo had been fired from Officer Ferry's gun when the gun slipped from Ferry's hand and discharged. Albert Winston, who was wearing a light-colored t-shirt, was apprehended on the first floor of the apartment.

Officers Thomas Ferry and Joseph DiGiacomo corroborated Fitzgerald's testimony regarding their involvement in the shooting incident. Ferry testified that he dropped his revolver as he drew it from his holster while approaching the stairs. The gun discharged but Ferry did not realize that the bullet had hit DiGiacomo. He saw no weapons being fired from the window of the apartment at the time DiGiacomo was shot and did not know who fired at least two subsequent gunshots. DiGiacomo testified that he did not hear or see any shots being fired before he was hit by a bullet. He did not know where the bullet came from at the time he had been shot.

Gerri Winston, the decedent's daughter, testified that on the night of the shooting, she was at home with her mother, father, sister and brother. Also present were her grandmother and aunt. After her aunt left the apartment, Gerri heard a gun being fired outside and she and her mother went to look out the living room window. Her mother then went to the door and opened it to look out. Gerri looked out the door and saw a policeman lying on the ground. Her mother then closed the door; and as they turned to go back to the living room, two shots were fired. Her

mother fell to her knees and crawled to the kitchen. Gerri testified that at the time of the shooting, her father was on the upper floor of the apartment and that he did not come downstairs until after her mother had been shot.

On cross-examination, Gerri testified that her father had been in the apartment on the night of the shooting but could not remember whether he had been there before that day. She admitted that she had stated previously that her father had returned to the apartment 2 or 2½ weeks before the shooting and that he had moved in about 3 days later. Gerri further testified that after the shooting, the decedent reached for a skillet on top of the stove and hit her husband before falling back down. She also stated that on the night before her mother was shot, she had witnessed an altercation between her parents.

After evidence relative to the issue of damages was presented, the plaintiff rested. Thereafter, the trial court granted directed verdicts for the city and Ferry on all counts and directed verdicts for Fitzgerald on counts I, II and IV. A verdict was directed in favor of the plaintiff against Fitzgerald on count III. The defendants then sought to present testimony by several witnesses that Albert Winston was present in the decedent's apartment before the day of her death, that Albert pointed a gun at the decedent on the evening before her death, that the decedent knew that Albert's gun was not in the apartment at the time she told Officer Fitzgerald that Albert had a gun, that a .45-caliber bullet recovered outside the decedent's apartment had markings consistent with the markings in Albert's gun, and that a bystander who witnessed the shooting saw flashes of light emanating from the upper-floor window of the decedent's apartment. The defendants were prohibited from presenting this evidence to the jury since the liability issue had been decided by the directed verdict rulings. Thereafter, the jury returned an award of $20,000 on count III. In ruling on the plaintiff's post-trial motion, the trial court reversed all of the directed verdicts and ordered a new trial on all the issues.

### Count I

Count I of the plaintiff's amended complaint sought recovery pursuant to section 1—4—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 1—4—5), which provides in part:

> "If any person in obeying the command of any such policeman [who as a member of the police department of a municipality having a population of 500,000 or more is engaged in the performance of his duties as a policeman] to assist in arresting or securing an offender is killed * * * the personal representatives of the

person so killed shall have a cause of action to recover the amount of such damage or injury against the municipal corporation by which such policeman is employed at the time such command is obeyed."

If injuries are suffered under the circumstances described in this statute, there is absolute liability by the municipality. (See *Meador v. City of Salem* (1972), 51 Ill. 2d 572, 284 N.E.2d 266 (construed Ill. Rev. Stat. 1965, ch. 24, par. 1—4—6, which applies to smaller populated municipalities).) In New York where a similar statute exists (*Meador v. City of Salem*), the court stated that no precise words of command are required by the statute so long as the direction for assistance is evident from the language employed by the police officer. (*Riker v. City of New York* (1953), 204 Misc. 878, 126 N.Y.S.2d 229, *aff'd without opinion* (1955), 286 App. Div. 808, 143 N.Y.S.2d 620.) That court further stated that liability under the statute could be determined as a matter of law where the plaintiff clearly has proved a causal relation between his injury and the command of the police officer.

■■ The plaintiff in the instant case argues that the trial court erred in granting a directed verdict for the city and denying a directed verdict for the plaintiff. A motion for a directed verdict should be granted only when all of the evidence, viewed favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Furthermore, a defendant is not entitled to a directed verdict at the close of the plaintiff's case unless the evidence, when viewed most favorably to the plaintiff, totally failed to establish one or more of the necessary elements of the plaintiff's cause of action. *Rogall v. Kischer* (1971), 1 Ill. App. 3d 227, 273 N.E.2d 681; see 3A Nichols, Illinois Civil Practice sec. 3485, at 234 (1977).

The evidence presented at trial in the case at bar presented a factual question as to whether the plaintiff was obeying the command of Officer Fitzgerald to assist in the arrest of Albert Winston. Although the plaintiff presented testimony that the decedent had been told a year prior to her death to contact the police when she knew of Albert's whereabouts and that the information she supplied the police assisted in Albert's arrest, the city attempted during the plaintiff's case to elicit additional reasons for the decedent's actions. It was the city's position that the plaintiff knew of Albert's whereabouts for more than a week before she called the police and that she did not make the call until after she had been involved in an altercation with Albert. Had the city been given an opportunity to present additional evidence on this issue during its case in chief, this factual dispute clearly would have required a jury determination.

■■ Considering the evidence that had been presented when the trial court granted the city's motion for a directed verdict, however, we cannot say that the evidence, when viewed most favorably to the plaintiff, failed to establish the necessary elements of the plaintiff's cause of action or that the evidence so overwhelmingly favored the defendant that no contrary verdict could ever stand. Similarly, we believe that the plaintiff was not entitled to a directed verdict (see 3A Nichols, Illinois Civil Practice §3503, at 242 (1977)), since the evidence, when viewed favorably to the city, did not overwhelmingly favor the plaintiff. Thus, as neither party was entitled to a directed verdict at the close of the plaintiff's case, the trial court correctly ordered a new trial on count I of the plaintiff's amended complaint.

### Count II

Based on the liability theory set forth in count I of the amended complaint, count II sought to recover for the decedent's pain and suffering and burial expenses. When the court directed a verdict in the city's favor on count I, it also directed a verdict on this count. As a new trial has been ordered on count I, we find it necessary to address the city's argument that the facts in the case at bar do not support recovery for pain and suffering.

In *Murphy v. Martin Oil Co.* (1974), 56 Ill. 2d 423, 308 N.E.2d 583, a case relied upon by the city, the Illinois Supreme Court abandoned the long-standing abatement rule that prevented recovery for personal injuries, including pain and suffering, when the victim died as a direct result of those injuries. (See Note, *Death of the Abatement Doctrine—Murphy v. Martin Oil Co.*, 24 DePaul L. Rev. 608 (1975).) There was no discussion in that case, however, as to the degree of proof necessary to support recovery for pain and suffering.

■■ The city contends that because the decedent in *Murphy* survived for nine days, there can be no recovery for pain and suffering in Illinois unless the evidence demonstrates a significant time lapse between the time of injury and the time of death. We do not believe that such a rule is implied from *Murphy*. The fact that a decedent has suffered for only a short period of time is not a bar to a claim for pain and suffering. (See *In re Air Crash Disaster* (N.D. Ill. 1980), 507 F. Supp. 21, and cases cited therein.) The duration of the pain and suffering affects the amount of damages to be awarded, not the ability to recover damages.

■■ The evidence in the instant case was that the decedent crawled from the front door of her apartment to the kitchen after she had been shot. The decedent's daughter testified that when her father came into the kitchen, the decedent grabbed a skillet from the stove, hit him with it and

then fell back. As the decedent was conscious for a time after she was shot, her death was not instantaneous; and in the event liability is found to exist under count I, the compensable damages should include recovery for the decedent's conscious pain and suffering. Therefore, the trial court correctly ordered a new trial as to count II.

## Count III

Count III of the plaintiff's amended complaint alleged that Officers Fitzgerald and Ferry were negligent in the performance of their police duties and that liability existed pursuant to the indemnity provisions of section 1—4—5 of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 1—4—5). At the close of the plaintiff's case, the trial court directed verdicts for the plaintiff against Fitzgerald and for Ferry against the plaintiff. The court stated that it would order the city to indemnify Fitzgerald after judgment was entered against Fitzgerald.

■█ The pertinent portion of section 1—4—5 of the Illinois Municipal Code provides:

> "In case any injury to the person * * * is caused by a member of the police department of a municipality * * *, while the member is engaged in the performance of his duties as [sic] policeman, and without the contributory negligence of the injured person * * *, the municipality * * * shall indemnify the policeman for any judgment recovered against him as the result of such injury, except where the injury results from the wilful misconduct of the police-man."

This provision does not create direct liability on the part of the municipality or the police officer. (*Arnolt v. City of Highland Park* (1972), 52 Ill. 2d 27, 282 N.E.2d 144; *Karas v. Snell* (1957), 11 Ill. 2d 233, 142 N.E.2d 46.) It creates liability on the municipality for indemnification after a judgment has been recovered against the officer. Until a judgment is obtained against the officer, no action, other than a possible third-party action by the police officer against the municipality, will lie pursuant to section 1—4—5 of the Illinois Municipal Code. (*Arnolt v. City of Highland Park.*) Thus, neither the city nor the officers were liable to the plaintiff based on the indemnity provisions of that section.

We also find that the defendants were not liable to the plaintiff under common law negligence theories. Pursuant to section 2—202 of the Local Governmental and Governmental Employees Tort Immunity Act (the Tort Immunity Act) (Ill. Rev. Stat. 1973, ch. 85, par. 2—202), a public employee is not liable for his actions in the execution or enforcement of any law unless the conduct is wilful and wanton. Section 2—109 of the

Tort Immunity Act provides that a public entity is not liable for any injury resulting from an employee's action where the employee is not liable.[1] ■■ In the case at bar, it is undisputed that the plaintiff's decedent was shot by Officer Fitzgerald while he and Officers Ferry and DiGiacomo were attempting to arrest Albert Winston. Clearly, the defendant officers were executing or enforcing a law at the time the decedent was injured. Therefore, under the Tort Immunity Act, the officers and the city were immune from liability for the negligent acts alleged by the plaintiff; and the trial court erred in granting a new trial on count III.

### Count IV

Count IV of the plaintiff's amended complaint sought recovery based upon allegations of wilful and wanton conduct by Officers Ferry and Fitzgerald. Although the trial court directed a verdict for the defendants at the close of the plaintiff's case, this decision was reversed during post-trial motions when a new trial was ordered on all issues.

■■ Under the Tort Immunity Act, a public employee is not immune from liability when, while enforcing or executing a law, he acts wilfully and wantonly. (Ill. Rev. Stat. 1973, ch. 85, par. 2—202.) Similarly, allegations of wilful and wanton conduct by a public employee are sufficient to state a cause of action against the municipality-employer. (*Hampton v. City of Chicago* (7th Cir. 1973), 484 F.2d 602, *cert. denied* (1974), 415 U.S. 917, 39 L. Ed. 2d 471, 94 S. Ct. 1413; *LaMonte v. City of Belleville* (1976), 41 Ill. App. 3d 697, 355 N.E.2d 70; see Ill. Rev. Stat. 1973, ch. 85, par. 2—109.) Therefore, as the allegations in the plaintiff's complaint stated a cause of action against all the defendants, we must examine the evidence presented at trial to determine whether it supports either of the trial court's rulings.

■■ In the case at bar, the plaintiff argued that the reckless use of firearms by Officers Fitzgerald and Ferry constituted wilful and wanton conduct. Wilful and wanton conduct has been defined as conduct which is

---

[1] The Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1973, ch. 85, pars. 1—101 to 10—101) must be read *in pari materia* with the indemnity provisions of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, pars. 1—4—5 and 1—4—6). (*Mills v. County of Winnebago* (1969), 104 Ill. App. 2d 366, 244 N.E.2d 65, *overruled on other grounds sub silentio, Arnolt v. City of Highland Park* (1972), 52 Ill. 2d 27, 282 N.E.2d 144; see *Krieger v. Village of Carpentersville* (1972), 8 Ill. App. 3d 243, 289 N.E.2d 481.) While the two legislative schemes are not totally compatible, our supreme court in *Arnolt* imparted meaning to both by applying the Tort Immunity Act only to acts "done while in the actual execution or enforcement of a law and not to every act or omission done while on duty as a public employee." (52 Ill. 2d 27, 33, 282 N.E.2d 144, 147.) The court stated that a police officer who is merely cruising in a vehicle while in the line of duty may not be immune from liability for his wrongful act if he was not enforcing or executing a law at the time the injury occurred. The officer could, however, be indemnified by the city as he was engaged in the performance of his duties. 52 Ill. 2d 27, 34, 282 N.E.2d 144, 147-48.

intentional or committed under circumstances exhibiting a reckless disregard for the safety of others. (*Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 69 N.E.2d 293; *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 411 N.E.2d 910.) A person is guilty of wilful and wanton conduct when he ignores known or plainly observable dangerous conditions and does something that will naturally and probably result in injury to another. (*Madigan v. Browning Ferris Industries* (1978), 61 Ill. App. 3d 842, 378 N.E.2d 568.) Whether a person is guilty of wilful and wanton conduct is a question of fact for the jury and should rarely be ruled upon as a matter of law. (*Dumpert v. Liechty* (1969), 114 Ill. App. 2d 59, 251 N.E.2d 652.) In determining whether a charge of wilful and wanton conduct ought to have been submitted to the jury, neither the trial court nor a reviewing court may resolve conflicts in the evidence, decide what weight to apply to the evidence or decide the relative credibility of the witnesses. In accordance with *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, a directed verdict should not be granted for the defendant unless it can be said that the evidence in its aspect most favorable to the plaintiff so overwhelmingly favors the defendant that a wilful and wanton verdict based thereon would never stand. *Madigan v. Browning Ferris Industries.*

The evidence viewed in its aspect most favorable to the plaintiff in the instant case shows that Officers Fitzgerald, Ferry and DiGiacomo ascended the stairway leading to the decedent's apartment. Ferry, who was behind Fitzgerald, dropped his revolver as he drew it from his shoulder holster and it slipped from his hand. When the gun discharged, hitting DiGiacomo, Fitzgerald thought that the bullet was fired from the apartment and fired two shots into the door. Ferry and DiGiacomo did not see a weapon being fired from the apartment before DiGiacomo was shot, and no weapons were recovered from the apartment after Albert Winston was apprehended. Fitzgerald testified that at the time he fired his weapon, he believed that the decedent's children were in the apartment.

■■ We believe that a jury could conclude that Officer Ferry was guilty of wilful and wanton conduct when he took his gun from his shoulder holster in a manner that allowed his gun to slip from his hand, to fall to the ground, and to discharge hitting Officer DiGiacomo. A jury also could conclude that Officer Fitzgerald was aware of the potential danger implicit in firing his gun into a closed door of an occupied apartment and that he chose to ignore the natural and probable result of his actions. As we cannot say that the evidence overwhelmingly favored either Officer Ferry or Officer Fitzgerald, the factual question of their wilfulness and wantonness was one for the jury to decide. Therefore, as neither party

was entitled to a directed verdict at the close of the plaintiff's case, the trial court correctly granted a new trial on count IV of the plaintiff's amended complaint.

## Damages

The final issue on appeal is whether the trial court erred in setting aside the jury award of $20,000 against Officer Fitzgerald under count III of the amended complaint. We have held that the plaintiff has no right to recover damages under count III. However, we find it necessary to address the adequacy of the award as this issue may arise on retrial in the event liability is found to exist on one of the other counts.

It generally has been stated that the amount of damages to be awarded in a wrongful death action cannot be determined with mathematical certainty and rests largely with the discretion of the jury. A jury verdict should not be set aside unless it is evidently the result of passion or prejudice, it bears no relation to the pecuniary injuries of the decedent's descendants (*Prather v. Lockwood* (1974), 19 Ill. App. 3d 146, 310 N.E.2d 815), or it is so low as to be a compromise upon the issue of liability and damages (*Long v. Bennett* (1977), 55 Ill. App. 3d 50, 370 N.E.2d 627).

In the case at bar, the plaintiff argues that a new trial on the issue of damages was warranted because the $20,000 verdict bore no relation to the damages sustained by the decedent's children. The plaintiff contends that the verdict was the result of defense counsel's improper attempt to appeal to the passion of the jury by stating that Officer Fitzgerald, the only defendant remaining in the lawsuit, would have to pay the verdict and by asking the jury to vindicate Fitzgerald by not awarding damages. ■■ We have reviewed the record in the case at bar, and we believe that the $20,000 verdict was so low as to be a compromise by the jury upon the issue of liability and damages. We also believe that the jury was prejudiced by defense counsel's improper remarks concerning the liability of Officer Fitzgerald when the liability issue had been decided as a matter of law and was not before the jury. Defense counsel's closing argument should have been limited to a discussion of evidence regarding the pecuniary loss to the decedent's children (Ill. Rev. Stat. 1973, ch. 70, par. 2), including the contributions of the decedent to her children and the economic conditions that existed at the time of the decedent's death without regard to the pecuniary circumstances of the children since the death of their mother. (*Pennsylvania Co. v. Keane* (1892), 143 Ill. 172, 32 N.E. 260; see *Ranson v. Wilson* (1948), 335 Ill. App. 7, 80 N.E.2d 381; Annot., 30 A.L.R. 121 (1924).) Thus, a new trial on the issue of damages was correctly ordered by the trial court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part, and the cause is

remanded for further proceedings consistent with the views expressed herein.

Affirmed in part; reversed in part; and remanded with directions.

McNAMARA and RIZZI, JJ., concur.