STEVEN ROGALL, a Minor, Plaintiff-Appellee, v. FRED KISCHER, JR., Defendant-Appellant.

(No. 70-249; ▮▮▮▮▮▮▮)

Second District—August 30, 1971.

*Rehearing denied October 20, 1971.*

Craig & Craig, Jack E. Horsley, and Richard F. Record, Jr., all of Mattoon, and Charley Popejoy, of Wheaton, for appellant.

Fred Lambruschi and Ralph Gabric, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Plaintiff, eleven years old at the time, suffered severe brain injuries as a result of an accident which occurred near the corner of North and Ferndale Avenues in Elmhurst. A jury trial resulted in a $230,000 verdict. The jury, by special interrogatories, found defendant guilty of negligence, the proximate cause of the accident, and plaintiff not guilty of contributory negligence.

Defendant appeals, contending: (1) that plaintiff failed to establish

a *prima facie* case and a directed verdict or a judgment *n.o.v.* should have been entered in his favor, and (2) that several errors occurred during the trial, any one of which necessitates a new trial.

The site of the accident is a T-shaped intersection at which Ferndale, a residential street, begins and extends northward from North Avenue, a heavily travelled, four-lane, east-west route which has a speed limit of 35 miles per hour. The intersection has no marked crosswalk and no stop lights. The accident occurred at approximately 7:00 P.M. on the evening of August 10, 1964. The weather was clear and visibility good; traffic was intermittent. Plaintiff, along with three other boys, ages 13 and 14, and a 2-year-old-girl, approached the intersection after leaving a small grocery store a few yards to the southeast. The boys had agreed to an evening football game but were going home first. When they reached a point near what would have been the southeast corner of the intersection had Ferndale extended on southward, the children divided into two groups. Two of the boys, David Sampson and Roger Barwis, walked west on the south side of North Avenue in order to cross at Shady Lane, another T-shaped intersection a short distance away. Plaintiff and Steve Barloga and Barloga's 2-year old niece, remained to cross at the intersection.

Defendant and his wife approached the intersection by turning east onto North Avenue from Route 83. The intersection of North and Route 83 is controlled by stop lights and is 1200 feet east of Ferndale. Defendant was driving a Karmann Ghia and was on his way to visit his hospitalized brother. He and his wife were not supposed to arrive at the hospital at any particular time. The Route 83 stop light being green, defendant did not stop prior to turning left onto North Avenue. As defendant approached the Ferndale intersection, his wife screamed and defendant saw plaintiff running across North Avenue from the south. The boy hit the right front side of defendant's automobile, and cracked the portion of its windshield which curved around to the right side of the car. The lower portion of the right front fender of the automobile was also slightly damaged. Plaintiff has no memory of the incident. At the time of the trial, Barloga was stated to be in military service and not available to testify.

The trial was lengthy and defendant asserts the occurrence of numerous errors.

For clarity, the remainder of the factual statement and the opinion shall be set forth in two sections, separately considering:

I. Motions for a directed verdict, judgment *n.o.v.* and the contention that the verdict was against the manifest weight of the evidence, and

II. Defendant's objections to certain events which occurred during the conduct of the trial.

I

Fred Kischer, Jr., defendant, testifying in his own behalf and under section 60 of the Civil Practice Act:

"My auto was in good operating condition at the time of the accident. I was operating the vehicle in third gear. At the time of the deposition I said I was unsure of what gear the automobile was in. When the boy hit my car I was travelling 20 miles per hour. The highest speed I obtained on North Avenue prior to impact was 20 to 24 miles per hour. At all times my automobile remained in the inside eastbound lane. There was another automobile travelling in the inside lane about 200 feet in front of my car. There was another automobile ahead of me in the outside lane and travelling about 20 miles per hour. In my deposition I said this automobile was about 40 feet in front of me but now I do not remember the distance it was ahead of me. A Thunderbird was approximately 150 feet behind me. I first saw the child when my wife screamed. My attention was called to the boy by my wife screaming. He was running to the north approximately 15 feet ahead of me and one foot past the center of the outside eastbound lane when I first saw him. I saw no other children around the intersection. I stopped my vehicle after he hit me in the inside lane. I was able to stop almost immediately—within 10 feet of the point of impact. When I applied the brakes I did not make an emergency stop. I just stopped. In my deposition I said I applied my brakes in an emergency fashion. During the deposition I placed my initials and mark on a photograph showing the point of impact to be at the center of the intersection."

Ruby Kischer, testifying for the defendant:

"I am the wife of the defendant. The automobile was travelling 20 miles per hour at the point of impact. In my deposition I said the vehicle was travelling 30 miles per hour. I don't know how far in front of our car the boy was when I first saw him, but he was in the middle of the outside lane. My husband did not sound the horn at the time of the occurrence. We stopped gradually. I was not talking to my husband at the time of the occurrence. In my deposition I said that I did not know whether I was talking to him at the time of the accident. The car travelled a short distance before stopping. In my deposition I said 20 feet."

Alfonso Martinez, testifying for the plaintiff:

"At the time of the accident I was driving a 1955 Thunderbird with a white top and a green bottom. I was going 40 miles per hour in an

easterly direction on North Avenue. Defendant was also travelling 40 miles per hour. At the time of the accident I was asked by police officers to write down what had occurred. I said in this report that defendant was not speeding. The reason I said he was not speeding, "I knew this man was in quite a bit of trouble the way it was by hitting the little boy, and I didn't want to get him into more trouble by stating that he had been speeding." I was speeding also. I saw no brake light on defendant's automobile. In my deposition I said defendant was travelling 31 to 39 miles per hour. At the time of the accident the speed limit on North Avenue was 30 miles per hour. I observed three children on the south side of the street. There was an Oldsmobile in the outside lane and somewhat ahead of defendant's automobile. All of the children originally started into the street, but two of them stopped and turned around and ran back. I saw the boy hit the automobile. It is my opinion that the Oldsmobile "could have been blocking" defendant's view and that the children ran into the street immediately after the Oldsmobile had passed. When the boy was hit he was thrown between 45 and 50 feet from the point of impact. He landed 20 to 30 feet from the cross walk. In my statement to the police I wrote the boy had fallen only 5 feet from the point of impact."

David Sampson, testifying for the plaintiff:

"I was 14 years old at the time of the accident and am 19 now. Roger Barwis and I were walking along the south side of North Avenue. I noticed an automobile traveling at a higher rate of speed than I was used to seeing." Even though I was 14, I was familiar with automobiles and could judge the speed of them. I had driven them but not on the highway. It is my estimation that the Karman Ghia was going 40 to 45 miles per hour, was in a low gear, and was accellerating. I mentioned the speed of the vehicle to Barwis and he said that he noticed it also. I did not see the accident. I heard brakes screach. When I arrived a short time afterwards, plaintiff was lying 20 to 25 feet east of the intersection. I did not mention the excessive speed of the Karman Ghia to the police at the time of the accident. The grocery store is 30 feet to the southeast of the intersection and when our group separated we had walked northwesterly to the southeast corner of the intersection. I saw some skid marks near the accident but I cannot identify them as being from the Karman Ghia."

Roger Barwis, testifying for the plaintiff:

"I was 13 years old at the time of the accident and I am 19 now. After Sampson and I left plaintiff 'just about at the intersection of Ferndale and North Avenue' we walked along the south shoulder of North

Avenue. Sampson made a remark about how fast this guy was coming by. I also made some remark about the speed of the vehicle. I thought that the vehicle which was travelling fast and in the inside lane was a Thunderbird. However, at the time I knew little about automobiles. Sampson, who was familiar with them, said the vehicle going fast was a Karman Ghia, not a Thunderbird. I did not see the actual accident. When I arrived at the scene, I saw glass which I believed to be from the Karman Ghia, scattered from approximately the east side of the T-shaped intersection to the point where plaintiff was lying in the street a few car lengths to the east. The intersection is not marked. I saw no skid marks in the street."

Robert Doyle, testifying for the defendant:

"I am a police officer for the City of Elmhurst. My records contain certain pictures of the accident. I made an investigation at the scene. This consisted of drawing a diagram and determining the location of the body where it was found. The boy had been moved when I arrived. I was told where he had been. The location of the boy was marked on the street with a stone. I do not know who placed the stone there. I don't remember who identified that location to me upon arriving. I made measurements concerning that location. From the measurements we determined the distance from the center of Ferndale to where the boy was located after the accident was 50 feet. Ferndale is 30 feet wide at the intersection. In my deposition I said both the boy and the car were in the inner lane. Mr. Kischer did say something to me about a car in front of him."

Gordon Graham, testifying for the defendant:

"I am a traffic engineer employed by the State of Illinois, Division of Highways. The speed limit at the time of the accident on North Avenue was 35 miles per hour."

Defendant first contends plaintiff failed to establish a *prima facie* case, that the court should have directed a verdict at the close of the case-in-chief or at the conclusion of all the evidence, or entered a judgment *n.o.v.* Defendant has presented 20 subpoints for this contention, each of which relates an admittedly valid proposition of law. However, none of these propositions is determinative of the factual situation in the instant case.

The questions before this court, as to his contentions, are three-fold. First, did the evidence at the end of the case-in-chief, when viewed most favorably to the plaintiff, totally fail to establish one or more of the necessary elements of the cause of action? (*Carter v. Winter* (1965), 32 Ill.2d 275, 282, *cert.* den. 382 U.S. 825, 15 L.Ed.2d 70, 86 S.Ct. 56

(1965).) Second, did all the evidence viewed in its aspect most favorable to plaintiff, so overwhelmingly favor defendant that no contrary verdict based on that evidence could ever stand? (*Pedrick v. Peoria & Eastern RR. Co.* (1967), 37 Ill.2d 494, 510.) Third, was the verdict against the manifest weight of the evidence in that an opposite conclusion was clearly evident? *Bunton v. Illinois Central RR. Co.* (1957), 15 Ill.App.2d 311, 322.

We have carefully reviewed the record and feel that the trial court was correct in denying the directed verdict, judgment *n.o.v.* and new trial motion based on the manifest weight of the evidence contention. All the evidence, viewed in its aspect most favorable to the plaintiff, presents the following picture: The accident occurred during daylight hours in good weather. Defendant was traveling 40 miles per hour which was five miles in excess of the speed limit. Martinez, following defendant, saw at least three children on the curb, but defendant saw no one. While the Oldsmobile may have obscured defendant's view to the right front, he saw no one until after his wife had seen the boy and had time to scream. Defendant did not sound his horn. Plaintiff had a right to cross in the unmarked intersection and was, in fact, in the intersection when he struck the side of the automobile. Defendant applied his brakes gradually, not suddenly, during the events in question.

██ We thus find that there was not a total failure of proof as to each element of the cause of action and that the evidence did not so overwhelmingly favor defendant that no contrary verdict could ever stand. As the trial judge said, "I have never seen a case which is so classical in its fundamental concept as to a factual question." Furthermore, we find that from all of the evidence summarized above an opposite conclusion is not clearly evident.

## II

Defendant objects to certain events which occurred during the course of the trial:

### The Motion Pictures

Prior to trial, an order had been entered directing both sides to produce any motion pictures taken of the plaintiff subsequent to the accident. During trial, plaintiff's attorney stated to the court that he had just learned of the existence of certain motion pictures taken of plaintiff, the same having been taken in response to a request by one of plaintiff's treating physicians; that the parents had not realized their possible importance to the trial; and that they had mentioned them to him only after the first day of trial. Plaintiff's counsel requested that the court and counsel for both parties view two reels of the film in chambers. The

judge, after viewing these motion pictures in the presence of both attorneys, admitted, over objection, portions of them which he said dealt with the rehabilitation methods used on plaintiff. He directed that other portions of the film be excluded as being inflammatory.

■ Had these moving pictures been properly produced prior to trial, this would have been a classical application of *Darling v. Charleston Memorial Hospital* (1964), 50 Ill.App.2d 253, 320-321, *aff'd* 33 Ill.2d 326 (1965), *cert.* den. 383 U.S. 946, 16 L.Ed.2d 209, 86 S.Ct. 1204 (1966). There the court held that a photograph taken of plaintiff's leg immediately prior to its amputation was properly admitted to evidence. Defendant argued that its purpose was to inflame, impassion and confuse the jury and unduly emphasize the injury. The court found that if the photographs had a reasonable tendency to prove some material fact, they could be properly admitted, and the question of their admissibility was one for the discretion of the trial court. In this case, the trial court carefully reviewed the film in the presence of both counsel, excluded those portions which it felt tended to inflame or prejudice the jury and included only those sections demonstrating techniques used in rehabilitating plaintiff. Thus, had plaintiff produced the motion pictures prior to trial, and the trial court conducted its review in the same manner as it did herein, there clearly would have been no abuse of discretion. Since the pictures were not produced until after the trial began, defendant argues that they should have been excluded, citing *Buckler v. Sinclair Refining Co.* (1966), 68 Ill.App.2d 283, or should have been excluded as a violation of the dignity and authority of the court, citing several cases. In *Buckler,* a party failed to list a witness in response to an interrogatory. The court held that refusal to employ any sanction was not an automatic abuse of discretion. Instead, it required the trial court to weigh various criteria in determining the appropriateness of any sanctions imposed. Among the criteria were surprise to the opposite party, the good faith of the party calling the unlisted witness, equal opportunity and access of the opposing party in interviewing and deposing the witness and prejudice to the opposing party. Similarly, here, we believe that the trial court did not abuse its discretion in finding no lack of good faith or prejudice to the opposing party when it accepted counsel's statement that the parents of the apparently incompetent minor were not aware of the value of the motion pictures taken several years previously at the request of a treating physician.

The cases cited by defendant in arguing that the court should exclude the motion pictures in order to uphold its own dignity, involve flagrant or repeated disregard for orders of the court and are therefore distinguishable from the instant case.

## The Photographs of the Karman Ghia

During the course of the trial, defendant produced photographs of the automobile which showed damage to the right front portion of the windshield and fender. These exhibits had written upon them "car damage" and had arrows pointing to the various damaged sections. The court, over objection, permitted the introduction of that portion of each photograph which was unmarked. This was accomplished by cutting out the unmarked sections of the photographs showing the broken window and introducing these sections only. The portion of the photograph showing the damage to the fender contained markings and was not admitted.

Defendant argues alternatively that changed conditions do not necessarily make the photographs inadmissible and the court incorrectly refused the admission of the marked photographs into evidence; or, that his case was prejudiced when he was forced to cut certain portions out of the pictures and introduce photographs which "assumed the character of a 'doctored' exhibit."

■ We find these arguments to be totally without merit. In *Brennan v. Leshyn* (1964), 51 Ill.App.2d 132, relied upon by defendant, the issue was whether a certain railing was present around a boiler pit at the time of an accident. The picture attempted to be introduced, was taken immediately prior to trial and showed such railing being present. The Appellate Court held that this type of photograph involved the principle issue of the case, *i.e.*, whether a railing was there at the time of the occurrence, and that it was within the discretion of the trial court to refuse its admission. This type of changed condition is not the same as an alteration on a photograph made after the time the picture was taken. The words "car damage", written on the photos by someone other than a testifying witness, amounted to a "doctored" exhibit and tended to emphasize certain evidence in issue, namely, damages to the car. Defendant's alternative claim that he was forced to introduce doctored exhibits (because the court cut away the markings on the photographs) is without merit. All the court did was to undo what the defendant had improperly done, and thereby un-doctored a doctored exhibit.

## The Police Officer's Diagram

■ Defendant tendered a diagram made by Officer Doyle at the scene of the accident. Defendant now contends that this portion of the police report was admissible because it contained physical observations and measurements of the scenes which would give the jury a clear picture of Doyle's testimony. (*Walls v. Jul* (1969), 118 Ill.App.2d 242.) However, our examination of the record shows that the basis for the court's refusal was correct in that the document was based in part on hearsay. As the

court said: "* * * inasmuch as Officer Doyle used hearsay in the preparation of this document as to the location of the body and so forth, that it was his reliance on what other people told him and not what he saw, that strictly speaking this document is part of the police report, I will have to deny its admission."

## The Martinez Statement

On direct examination, Martinez stated he saw children "crossing or attempting to cross" North Avenue. On cross-examination, defendant questioned him concerning a statement he had given to the police the night of the accident. Counsel said, "Did you at that time tell the police that you saw it as three boys trying to beat traffic across North Avenue?" The court sustained plaintiff's objection. Our review of the testimony of Martinez reveals that he made no contrary statements either on direct or cross-examination which would permit the use of this statement for impeachment purposes. Therefore the court properly sustained the objection and prohibited the witness from invading the province of the jury by giving his opinion of one of the contested issues of the case.

## Plaintiff's Closing Argument

Plaintiff's counsel began his closing argument by saying: "Good morning, your Honor, Judge Philip Locke, Mr. Popejoy and company, and Mr. Kischer." "We will excuse him. We will excuse Stephen for the summation." No objection was made. Later in his argument, counsel stated a law inapplicable to the case; defendant objected. Counsel then began to read from an instruction; defendant objected on the grounds that counsel was invading the province of the court and its objection was sustained. Plaintiff's counsel then made reference to a certain photograph and stated, "Where is that photograph? Who took that photograph?"; defendant objected saying that he would offer the photograph into evidence. The court, however, sustained the objection. During his argument, plaintiff's counsel employed the word "they" in reference to defendant.

Defendant argues that the unobjected to "and company" statement, the reference to the person who took the picture and the use of the term "they" were improper references to insurance. Plaintiff responds that the reference to "and company" was merely a reference to the several attorneys who sat with defense counsel during the trial. Our interpretation, upon reading the entire closing argument, discloses no reference to insurance, either direct or oblique. Further, the court sustained defendant's objections as to the latter claimed errors and no objection was made to the first.

Defendant further contends that counsel's excusing plaintiff during closing statements was prejudicial, relying upon *Lange v. Coca-Cola*

*Bottling Co. of Chicago* (1969), 105 Ill.App.2d 99, reversed for other reasons, 44 Ill.2d 73 (1969). In that case, counsel's explanation of his client's absence was based upon matters not in evidence which, of and by themselves, led only to inflame the passion of the jury. The same factual situation is not present here; that case is, therefore, distinguishable.

■ The statement, "We will excuse him. We will excuse Stephen for summation," in our view did not prejudice the jury. We are of the opinion that because of the mental condition of the plaintiff, together with the fact that closing argument would of necessity require a lengthy discussion of his injuries, it was not error for the court to allow such procedure. This is especially so when no objection was made by the defendant at the time.

*Instructions*

■ Finally, defendant claims error in the giving of two instructions. One of the allegations in plaintiff's pleading was that defendant was negligent for failure to sound a horn. Illinois law imposes a duty upon one to sound a horn when necessary to avoid colliding with a pedestrian. Defendant argues that this theory of the case was unsupported by the evidence. We disagree. Defendant's wife specifically stated that defendant did not sound his horn before impact.

For the reasons stated, the judgment of the trial court will be affirmed.

Judgment affirmed.

SEIDENFELD and STROUSE, JJ., concur.