PREM J. MUNJAL *et al.,* Plaintiffs-Appellees, v. BAIRD & WARNER, INC., *et al.,* Defendants-Appellants.

Second District   Nos. 2—84—0444, 2—84—0445 cons.

Opinion filed October 18, 1985.

R. Lee Huszagh and Leigh R. Pietsch, both of Nelson, Pietsch, O'Leary, Walters & Cuchna, of Wheaton, for appellants.

Nancy A. McKeating, of Rooks, Pitts, Fullagar & Poust, and David G. Mountcastle, of Mountcastle & DaRosa, P.C., both of Wheaton, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Plaintiffs, Prem and Sudesh Munjal, brought this action against defendants, Baird & Warner, Inc. (Baird & Warner), Richard M. Bartelt (Bartelt) and Philip and Christine Verdung (Verdungs), alleging common law fraud and misrepresentation pursuant to the Consumer Fraud and Deceptive Business Practices Act (the Act) (Ill. Rev. Stat. 1981, ch. 121½, par. 262) in connection with the sale of a home in St. Charles. The plaintiffs specifically alleged that they were damaged by the defendants' fraudulent concealment of a flooding problem in the basement of the home which they purchased from the Verdungs in 1980. Following a jury trial, judgment was entered in favor of the plaintiffs in the amount of $43,000. On appeal defendants raise five contentions of error: (1) that the jury verdict was against the manifest weight of the evidence; (2) that the trial court erred in permitting plaintiffs' counsel to use Christine Verdung's deposition to refresh the memory of Philip Verdung; (3) that the court below erred in denying defendant Verdung's motion to view the premises; (4) that the lower court erred in admitting the testimony of plaintiffs' real estate appraiser; and (5) that the jury improperly determined the measure of damages resulting in a windfall to plaintiffs.

The home was constructed by defendants, Philip and Christine Verdung, in 1976. Several creeks run through the property and intersect with Norton Creek, a larger stream seven or eight hundred feet north of the residence. At trial Philip Verdung testified that he was present when excavation for the house was begun in 1976 and he recalled no water problems at that time. He also stated that he had no knowledge that the house was on a floodplain until several years after the house was sold. He later qualified that statement by admitting that in 1976 he had been notified by the village of Wayne that a significant portion of the five-acre parcel was on a floodplain. He also admitted that while no adverse water conditions were noted on the home's building and zoning permits, he did encounter some water leakage in the northwest side of the basement in the fall of 1979.

The Verdungs separated and the home was placed on the market with defendant-real estate broker, Bartelt, of Baird & Warner. Plaintiffs saw an ad for the property and contacted Bartelt for an inspection. The plaintiff, Dr. Munjal, testified that he first visited the subject property with defendant Bartelt on January 30, 1980, and at that time noticed a large pool of water approximately 12 by 10 feet wide in the northeast corner of the basement. He also noticed a sump pump with a plastic sheet wrapped around it, running continuously. He immediately asked Bartelt if there was a flooding problem and the broker told him that the excess water was only caused by a leaky check valve on the sump pump. Bartelt also advised him that the valve would be fixed and there would be no further problem.

About a week later plaintiff took his wife to see the property and observed the same situation with the water and the sump pump. Bartelt again explained that it was only a leaky check valve, that once the sump pump was raised, the pump would stop running so frequently. He also assured them that he would see to it that the problem was corrected. The plaintiff stated that he accepted Bartelt's explanation and signed the contract to purchase the property around February 8, 1980.

Plaintiff testified that he reinspected the premises on two subsequent occasions and noticed the same problem with the water and sump pump. He said he asked Bartelt when it would be repaired and was told it would be fixed by the time of closing and there would be no further problems. He also repeatedly asked Bartelt if he could tour the house with Verdung to find out if there was anything else he needed to know about the house. Bartelt advised him that he was extremely busy but would try to arrange such a meeting.

Plaintiff's subsequent inspection with Bartelt approximately one week before closing revealed that the check valve on the sump pump had been fixed and there was no longer any flooding from the pump. However, plaintiff observed that the pump still ran continuously and also noticed water leakage around the northwest wall of the basement. Evidently all the boxes and furniture that had previously been in the basement had been removed and plaintiff could then see, for the first time, water leaking into the northwest side of the basement. At this point plaintiff told Bartelt that the house had a flooding problem and he did not want to buy it. Bartelt agreed there was a problem and advised plaintiff to talk to his attorney; however, he also warned plaintiff that he was not sure plaintiff could get his $20,750 in earnest money back. According to Bartelt, he knew nothing about the water leakage in the northwest wall prior to that inspection; he had

only been aware of excess water in the northeast corner caused by what he had been told by Verdung was a leaky check valve. He said that although he had noticed some wet boxes and water damage to the basement stairs, he assumed the damage was due to the faulty pump and that at no time during the year and a half that the house was up for sale did he or Baird & Warner make any further investigation of the problem.

Plaintiff testified that after consulting his attorney, the contract was not cancelled but arrangements were made with Bartelt to obtain three estimates for correcting the problem in the northwest corner of the basement. A $1,100 bid from Mike Carr at Structural Concrete was accepted and presented at closing.

On April 14, 1980, the day prior to closing, plaintiff again toured the premises, this time with Ray Madejewski, an acquaintance who had had previous experience in supervising construction. Madejewski was shown the entire house including the basement. Based on a brief five-minute visit to the basement, he indicated that the proposed work by Carr might take care of the water problem. However, plaintiff testified that Madejewski had no special expertise in foundation construction or engineering, and that he had only asked him there to give him his overall impression of the house.

Also present at that inspection was defendant-seller, Philip Verdung. Plaintiff stated that during his visit he noticed a lot of noise coming from two sump pumps in the basement and he asked Verdung about it. According to plaintiff, Verdung replied that the sump pumps had just been raised and that this would eliminate the constant pumping. When asked about the water seepage in the northwest wall, Verdung stated that he had noticed some leaking approximately two years before that but that it had dried up and he had done nothing further about it.

The following day, April 15, 1980, the closing was held. Plaintiff testified that the only problem encountered was that he asked for a full guarantee on the basement to cover any future water problems, but was only given a guarantee on Mike Carr's work on the northwest corner along with Verdung's written guarantee to cover Carr's costs over and above the $1,100.

Approximately two to three weeks after the closing, Carr performed the proposed repairs, plus some additional work requested by plaintiff. Immediately after the drain was installed, there was no longer water in the northwest corner of the basement. However, before moving into the house in June 1980, plaintiff discovered about six inches of water in the basement. This flooding continued to occur

about four or five times during the next six months. Evidently the flooding would occur whenever the sump pumps shut down due to an electrical failure; it would then subside once the pumps started up again, although some freestanding water always remained in the northeast corner of the basement. There would also be accumulations of up to an inch of water in the basement after a heavy rainstorm even with the sump pumps running continuously.

Plaintiff testified that when he contacted Verdung shortly after the closing about the problem, Verdung came out to view the property and stated that there must be either a spring or artesian well underneath the basement. Carr, who performed the work on the northwest corner of the basement in 1980, testified at trial that in his judgment there was free flowing water under the floor slab in the basement and that the bottom of the basement floor was very close to if not lower than, the stream bed. He stated that, in his opinion, a high water table was causing the flooding problem in the basement.

Maxwell Calhoon, a professional engineer specializing in field and soil mechanics, testified that as a result of soil borings taken from the subject property on January 2, 1984, it was his opinion that a substantial portion of the house was definitely on a floodplain. He also stated that the ground water level was approximately eight inches above the basement floor, causing the sump pumps to run all the time. According to the witness, there was no doubt that the house was prone to flooding given a heavy rainfall, a pump failure or a combination of both. He further testified that it was likely these conditions existed from the time the house was built, although he stated that the excavation itself may have taken place during a dry season when the water table was low.

Kelly McGinley, manager of the loan closing department of Mid-America Federal Savings (Mid-America), plaintiffs' mortgagee, testified that the subject property was valued by Mid-America at $228,000 on February 15, 1980. Roy Krueger, a certified real estate appraiser contacted by plaintiffs in the fall of 1980, testified that on November 12, 1980, he appraised the value of the subject property without flooding problems at $205,000. With these defects, he estimated the fair market value of the property to be $185,000.

The plaintiffs initiated their action for damages by filing a five-count complaint against defendants Baird & Warner, Bartelt, Philip Verdung and Christine Verdung, in December 1980 (subsequently amended in November 1981), alleging *inter alia* that defendants, with the intent of deceiving and defrauding plaintiffs, induced plaintiffs to purchase the home in St. Charles by representing that accumulations

of water in the basement were temporary, were caused solely by a check valve leakage and were easily remedied, and that said representations were false and were known by defendants to be false and that such misrepresentations constituted fraud and, in the case of defendants-brokers, violated the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 262). The case proceeded to trial on January 31, 1984, and on the same date Christine Verdung was dismissed as a party-defendant. At the conclusion of plaintiff's case, counsel for defendants moved for directed verdicts. Defendant Verdung's counsel also moved for a directed verdict at the completion of the trial. All of the motions were denied. Defendant Verdung also requested that the jury be permitted to visit the premises, which was also denied. On February 3, 1984, the jury returned a verdict in favor of plaintiffs in the amount of $43,000, the difference between the appraised value given by Mid-America in February 1980, and the appraised value of the home with existing defects according to Krueger in November 1980. Defendants subsequently filed this appeal.

■ Defendants' first contention is that the trial court erred in denying defendants' motion for directed verdicts at the conclusion of plaintiffs' case and in denying defendant Verdung's motion for directed verdict at the completion of the trial. They further assert that the jury verdict was against the manifest weight of the evidence.

It is well established that a motion for directed verdict should only be granted when all of the evidence, viewed favorably to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) Furthermore, a defendant is not entitled to a directed verdict at the close of plaintiff's case unless the evidence, when viewed most favorably to the plaintiff, totally fails to establish one or more of the necessary elements of the plaintiff's cause of action. *Glover v. City of Chicago* (1982), 106 Ill. App. 3d 1066, 436 N.E.2d 623; *Rogall v. Kischer* (1971), 1 Ill. App. 3d 227, 273 N.E.2d 681.

In applying these principles to the case at bar, the initial inquiry is whether plaintiffs produced sufficient evidence to support finding defendants guilty of misrepresenting material facts to plaintiffs with the intent to deceive under a theory of common law fraud (intentional misrepresentation) or pursuant to the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 262).

Since the tort of misrepresentation involves fraud, a party claiming fraud is required to prove that element by clear and convincing

evidence. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 222, 446 N.E.2d 499; *Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 655, 418 N.E.2d 506.) This standard requires evidence stronger than that which merely predominates, but does not require proof beyond a reasonable doubt. (*Oltmer v. Zamora* (1981), 94 Ill. App. 3d 651, 655, 418 N.E.2d 506; *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 398 N.E.2d 198.) In order for a statement (or act) to constitute fraudulent misrepresentation it must be (1) of a material nature; (2) untrue; (3) known by the person making it to be untrue, believed by him to be untrue, or made in culpable ignorance of its truth or falsity; (4) relied on by the victim to his detriment; (5) made for the purpose of inducing the reliance; and, (6) such that the victim's reliance led to his injury. (*Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 335, 463 N.E.2d 1359; *Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 48, 390 N.E.2d 393.) Whether the plaintiff has proved these elements is to be determined by the trier of fact (*Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 335, 463 N.E.2d 1359; *Gordon v. Dolin* (1982), 105 Ill. App. 3d 319, 324, 434 N.E.2d 341), whose decision will not be disturbed unless it is against the manifest weight of the evidence. *Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 410, 454 N.E.2d 723.

Defendant Verdung argues that there was no evidence that he made any false representations to plaintiffs concerning water in the basement in order to induce plaintiffs to purchase the said property. He further contends that plaintiffs failed to show their reliance upon any alleged misstatements since they saw water in the northwest corner of the basement prior to closing and used their own experts (Madejewski and Carr) to estimate the extent and cost of repair. He thus concludes that plaintiffs failed to prove fraud. We disagree.

Expert testimony by Maxwell Calhoon established that the underlying defect with the house was that the foundation was built lower than the level of ground water. His testimony also established that said defect would not be visible to the naked eye but that it probably would have caused flooding from the time the home was built. Other testimony indicated that the market value of the home with the flooding defect was approximately $22,500 less than the purchase price of the home. We think this demonstrates that plaintiffs were not made aware f the hidden defect until after the purchase of the home and that, ఆ a consequence, they sustained a substantial loss. We do not believe that because plaintiffs saw sump pumps in the basement, or noticed the leaking in the northwest corner wall, they were made cognizant of the fact that the home was improperly built. Accordingly, we

think it was reasonable for the jury to infer that defendant Verdung had prior knowledge of an extensive flooding problem and that plaintiffs relied to their detriment on his silence in not disclosing this fact. Such an omission as to a material fact has been found to constitute fraud. *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 336-39, 463 N.E.2d 1359; *Posner v. Davis* (1979), 76 Ill. App. 3d 638, 644, 395 N.E.2d 133; *Russow v. Bobola* (1972), 2 Ill. App. 3d 837, 841, 277 N.E.2d 769; *Reimer v. Leshtz* (1980), 90 Ill. App. 3d 980, 983-84, 414 N.E.2d 114.

As observed by this court in *Russow v. Bobola* (1972), 2 Ill. App. 3d 837, 841, 277 N.E.2d 769:

> "Fraud has been said to comprise anything calculated to deceive, including all acts, omissions and concealments involving a breach of legal or equitable duty, trust or confidence resulting in damage to another. [Citation omitted.] This deception may consist of a single act or combination of circumstances, suppression of truth or suggestion of what is false, direct falsehood or innuendo, speech or silence, look or gesture. *People v. Gilmore* (1931), 345 Ill. 28, 46; *Citizens Savings & Loan Ass'n v. Fischer* (1966), 67 Ill. App. 2d 315, 322."

While silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment. (*Russow v. Bobola* (1972), 2 Ill. App. 3d 837, 841, 277 N.E.2d 769.) In such a case, if a party to a contract of sale does not disclose the whole truth, having the requisite intent to deceive, this amounts to fraud equal to an affirmative falsehood. *Russow v. Bobola* (1972), 2 Ill. App. 3d 837, 841, 277 N.E.2d 769; *Forest Preserve District v. Christopher* (1943), 321 Ill. App. 91, 105-06, 52 N.E.2d 313.

Evidence at trial showed that defendant Verdung was involved in the construction of the residence, that he lived there for at least 2½ years and that there were traces of water damage to boxes and a stairwell when the property was put up for sale. It was also undisputed that during several preclosing inspections there were two or more sump pumps in the basement which ran almost continually. We think this was sufficient circumstantial evidence to indicate that Verdung had ample opportunity to notice a chronic water problem in the basement. The record indicates that upon inquiry Verdung's only comment to plaintiffs was that some leaking had occurred in the northwest wall two years before, and that the sump pumps needed to be raised. We conclude that Verdung's failure to disclose the full extent of the problem was an attempt to deceive plaintiffs in order to induce them to purchase the property for a value that did not include the de-

fect. The intent to deceive may be proved by means of circumstantial evidence (*Mother Earth, Ltd. v. Strawberry Camel, Ltd.* (1979), 72 Ill. App. 3d 37, 50-51, 390 N.E.2d 393), and whatever circumstances, when proven, convince the mind that the fraud charged has been perpetrated, is all that is required. (*Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 410, 454 N.E.2d 723.) Accordingly, we do not find the jury's finding of fraud as to defendant, Verdung, against the manifest weight of the evidence.

■ We do not, however, find there was sufficient evidence to prove fraud against defendant-broker Bartelt, and Baird & Warner. The relationship existing between a broker and an owner of property is one of agency and is created by a contract of employment between the parties. (*Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 871, 400 N.E.2d 614.) However, there is no agency relationship formed between a purchaser and a real estate broker. (*Buzzard v. Bolger* (1983), 117 Ill. App. 3d 887, 891, 453 N.E.2d 1129, 1131.) Nonetheless, real estate brokers do occupy a position of trust with respect to purchasers with whom they are negotiating and owe a duty to exercise good faith in their dealings with purchasers even absent the existence of an agency relationship. *Sawyer Realty Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, 385-86, 432 N.E.2d 849.

Although this court has previously recognized that misrepresentation of material facts made intentionally by a broker and relied upon by purchasers could well be the basis of a suit for fraud and deceit (*Buzzard v. Bolger* (1983), 117 Ill. App. 3d 887, 891, 453 N.E.2d 1129, 1131; see also *Duhl v. Nash Realty, Inc.* (1981), 102 Ill. App. 3d 483, 491-92, 429 N.E.2d 1267), we do not think the evidence in this case supports a finding that the defendants-brokers intentionally or in culpable ignorance of the truth misrepresented that the house did not have a flooding problem with the result that plaintiffs relied on said statements to close on the house. It was Bartelt's testimony that up until the date of final inspection, he was not aware of any water defects except for the leaking check valve. The evidence showed that, in fact, the pool of water observed by plaintiffs in the northeast corner of the basement did clear up once the valve was repaired. It is also undisputed that Bartelt, after observing the leaking in the northwest wall simultaneously with plaintiffs, agreed that the basement definitely had a water problem, and advised plaintiffs to talk to their attorney. This convinces us that the brokers were not attempting to intentionally conceal a water defect from the plaintiffs and that plaintiffs did not rely on their statements in proceeding with the purchase of

the house. Finally, in the absence of any case law to the contrary, we are unwilling to find a duty on the part of a real estate broker to discover any latent material defects on property which a seller has not disclosed to him prior to sale. To do so would place an unwarranted burden on real estate brokers as a whole. Thus, we do not think the defendants-brokers, in this case, were obligated to make a full investigation as to whether there was an actual flooding problem in the house without clear evidence of same or without disclosure by the seller.

We also do not find that the defendants-brokers violated section 2 of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1981, ch. 121½, par. 262). Section 2 of the Act, which has been held applicable to misrepresentations by real estate brokers to prospective purchasers (*Beard v. Gress* (1980), 90 Ill. App. 3d 622, 627, 413 N.E.2d 448), provides as follows:

> "Sec. 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." Ill. Rev. Stat. 1981, ch. 121½, par. 262.

As discussed in the case of *Duhl*, section 2 of the Act was enacted to broaden the protective coverage of consumers from many types of deceptive or unfair practices (*Duhl v. Nash Realty, Inc.* (1981), 102 Ill. App. 3d 483, 495, 429 N.E.2d 1267; *American Buyers Club v. Honecker* (1977), 46 Ill. App. 3d 252, 361 N.E.2d 1370), and, as a result, plaintiffs suing under the Act are not required to establish all the elements of fraud. (*Perlman v. Time, Inc.* (1978), 64 Ill. App. 3d 190, 380 N.E.2d 1040.) Thus, under the Act, it is not necessary for a plaintiff to show actual reliance nor diligence in ascertaining the accuracy of the misstatements. (*Beard v. Gress* (1980), 90 Ill. App. 3d 622, 627-28, 413 N.E.2d 448; *Grimes v. Adlesperger* (1978), 67 Ill. App. 3d 582, 384 N.E.2d 537.) Moreover, it has been held that the good or bad

faith of the seller is irrelevant under the Act; consequently, a plaintiff can recover for even innocent misrepresentations. *Beard v. Gress* (1980), 90 Ill. App. 3d 622, 627-28, 413 N.E.2d 448; *American Buyers Club v. Honecker* (1977), 46 Ill. App. 3d 252, 361 N.E.2d 1370.

Plaintiffs argue that defendants' representations, innocent or otherwise, to the effect that the leaky check valve was the only cause of the excess water and that once it was fixed there would be no further problem, were misrepresentations in violation of the Act. We cannot agree.

As previously stated, we decline to find a real estate broker liable for latent or hidden defects of which he had no prior knowledge. Further, we believe that any alleged misrepresentations as to the extent of the water problem made by defendants-brokers were cured when, before closing, plaintiffs observed the leakage in the northwest wall of the basement and declared that the house had a flooding problem and they did not want to buy it. The record is unequivocal that Bartelt agreed that there was a problem and that the plaintiffs should consult their attorney to decide on a course of action. We think Bartelt's actions were reasonable in light of the circumstances and absolved him from any question of deception or concealment in inducing plaintiffs to purchase the property knowing there was a flooding problem. Consequently, we believe the plaintiffs failed to establish by clear and convincing evidence that defendants were guilty of fraud or violated section 2 of the Act. Ill. Rev. Stat. 1981, ch. 121½, par. 262.

■ The second issue which the defendants raise on appeal is whether the trial court erred in permitting plaintiffs' attorney to cross-examine defendant Verdung using the deposition of Christine Verdung to refresh his memory. They contend that plaintiffs' counsel actually used the deposition for purposes of impeachment and that such use of statements made by a person no longer a party to the suit was improper and resulted in substantial prejudice to the defendants.

The relevant dialogue occurred when plaintiffs' counsel asked defendant Verdung whether his testimony that he never encountered water or anything in the nature of a spring during construction of the subject premises was correct. Verdung replied, yes, that was his testimony. Despite this answer, plaintiffs' counsel went ahead and showed Verdung certain pages from Christine Verdung's deposition to "refresh" his memory. When defense counsel asked what it was, plaintiffs' counsel told him and defense counsel objected. The court overruled the objection and counsel continued, "Well, I'd just like you to read this. You don't have to read it to the jury, read it to yourself and tell if it refreshes your recollection about a spring being encountered

during the construction of the property." There were further objections but plaintiffs' counsel pursued it further until Verdung repeated that, "No, the document doesn't do anything for me." The court finally admonished the jury to disregard any reference to Christine Verdung's deposition. at that point counsel for defendant Verdung moved for a mistrial, which was denied.

It is axiomatic that a witness' memory can be refreshed only after it has been established that he has no memory concerning the facts in question. (*People v. Kraus* (1941), 377 Ill. 539, 37 N.E.2d 182.) It has also been held that while the statements of other witnesses may be used to refresh a witness' recollection, they may not be used to impeach that witness. (*Champion v. Knasiak* (1974), 25 Ill. App. 3d 192, 323 N.E.2d 62; *Greig v. Griffel* (1977), 49 Ill. App. 3d 829, 364 N.E.2d 660, 669.) Here, defendant Verdung repeatedly testified that he did not need his memory refreshed on the point in question; yet, plaintiffs' counsel persisted in showing him the statements of Christine Verdung and describing them before the jury. Moreover, even if this line of questioning qualified as present recollection refreshed, on cross-examination the rule with reference to refreshing the recollection of a witness does not apply. (*Ryan v. Monson* (1961), 33 Ill. App. 2d 406, 413, 179 N.E.2d 449.) Rather the only proper way to attack a witness is to ask him specific questions regarding his prior inconsistent statements made in a pretrial deposition. (33 Ill. App. 2d 406, 413, 179 N.E.2d 449.) In the instant case, we are of the opinion counsel's cross-examination of Verdung with the deposition of Christine Verdung was an improper attempt at impeachment. However, the record reveals that the trial court eventually admonished the jury to disregard references to the contents of Christine Verdung's deposition. The record also shows that there had already been testimony from plaintiff Munjal that defendant Verdung had indicated to him in the summer of 1980 (after purchase of the home) that there might be a spring or well under the house. In addition, there was other testimony and circumstantial evidence that could lead the jury to believe defendant Verdung had some prior knowledge of a water problem in the basement of the subject premises. We fail to find reversible error on this issue.

■ Defendants' next contention is that the trial court erred in denying defendant Verdung's motion to view the premises in order for the jury to more accurately assess the damages. We disagree.

Whether a trial court allows the jury to view and inspect a subject premises, other than where expressly provided by statute, is within the sound discretion of the court and is not to be disturbed absent a

clear abuse of discretion. (*Pike v. City of Chicago* (1895), 155 Ill. 656; *City of Springfield v. McCarthy* (1898), 79 Ill. App. 388, 390.) Except in condemnation cases, a jury's view of the *locus in quo* does not constitute evidence and is permitted only to enable a jury to better understand and apply the evidence. (*J.F. Humphreys & Co. v. City of Bloomington* (1927), 246 Ill. App. 334, 341; *City of Chicago v. Mc-Shane* (1902), 102 Ill. App. 239, 243.) In addition, where the jurors are familiar with the location and surroundings of the site or where the scene is adequately portrayed by photographs or diagrams a view may properly be refused. *J.F. Humphreys & Co. v. City of Bloomington* (1927), 246 Ill. App. 334, 342.

Plaintiffs offered expert testimony as to damages as well as photographs as to the flooding, and maps illustrating the elevations and location of the house in relation to other physical features of the parcel. We find that the trial court did not abuse its discretion in denying this request. We further feel that the jury view would not have revealed the fact that the basement was constructed below ground water level.

■ We next address defendants' contention that the testimony of Roy Krueger, plaintiffs' real estate appraiser, should have been stricken because his appraisal of the property was done more than nine months after the original appraisal ordered by plaintiffs' mortgagee, Mid-America. Defendants argue that evidence of the value of real property must relate to the time of sale, thus, Krueger's appraisal was too remote in time to be admissible.

The record reveals that in February 1980 plaintiffs signed the contract to purchase the property for $207,500. The closing was held in April 1980, and plaintiffs moved into the house in June of that year. Within six months of their occupancy, and after several incidents of flooding, plaintiffs contacted Krueger for an expert opinion as to how the flooding problem affected the value of their property. At trial Krueger testified that his estimate of the fair market value of the house in November 1980, without any flooding problem, was $205,000. He also testified that with the water defect, he would appraise the market value of the house at $185,000. This was the only expert testimony presented to the jury as to the estimated value of the home with and without the alleged defect. One proper measure of damages in cases of fraudulent misrepresentation or concealment is the value the property would have had at the time of sale if the defects did not exist, minus the value the property actually had at the time of the sale due to the defects. *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 341, 463 N.E.2d 1359; *Posner v. Davis* (1979), 76 Ill.

App. 3d 638, 395 N.E.2d 133.

However, it is fundamental that evidence of the value of real property must be reasonably related to the time when the property is to be valued or it will be deemed inadmissible:

"In order to be relevant, evidence on an issue as to the value of real estate must relate to the time as of which the value of the property is to be determined, or to a time so near thereto that it may reasonably throw light on the value at such time; and evidence of value at a time considerably before or after the time to which the controversy relates is not admissible, unless it also appears that the value has remained the same." (31A C.J.S. *Evidence* sec. 182(6), at 476 (1964).)

Here, there was no evidence presented as to the value the property had with the defects at the exact time of sale. However, Krueger's estimates were made within nine months of the sale. We do not think such a time period was enough to render Krueger's opinions irrelevant or mislead the jury as to the value the property had with and without the defects. Further, Krueger's estimated value of the house without defects was within $2,500 of the actual purchase price, indicating that the value of the house had not changed significantly in nine months. Although defendants disagree and assert that substantial changes in the real estate industry did occur between February and November 1980 which would have affected the value of the home, they failed to offer any documentation for this allegation. Finally, we note that Krueger's testimony provided the only evidence available, within a year of the sale, which could aid the jury in calculating the reasons of damages under the *Kinsey* and *Posner* formulas. We, therefore, conclude that, under the circumstances of this case, the expert testimony of Roy Krueger was probative and admissible on the issue of damages.

■ We agree with defendants' final contention that the jury incorrectly determined the measure of damages in this case. The record shows that the jury returned a verdict in favor of plaintiffs in the amount of $43,000, the difference between the property's appraised value of $228,000 made by Mid-America in February 1980 and the $185,000 valuation made by Krueger in November 1980. We believe that such an award was based on an improper application of the *Kinsey* and *Posner* formulas set forth above.

In Illinois, a purchaser of property who has established fraud is entitled to damages which will give him "the benefit of [his] bargain." (*Kinsey v. Scott* (1984), 124 Ill. App. 329, 341, 463 N.E.2d 1359, 1367.) As we have previously noted, one method of calculating dam-

ages in cases of fraudulent misrepresentation or concealment is the difference between the value that the property would have had at the time of sale if the defects did not exist and the value the property actually had at the time of the sale due to the defects. (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 644-45, 395 N.E.2d 133.) In the instant case, the purchase price of the property was $207,500. The purchase price of a home without alleged defects has been held to be *prima facie* evidence of the value at the time of sale in a suit for misrepresentation or concealment. (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133, 138; see also 37 Am. Jur. 2d *Fraud Deceit* sec. 353 (1968).) In the six months after the sale, the property in question was found to have a market value of $185,000 with the flooding problem. The jury received instructions that should they find the defendant(s) liable, they were to fix the amount of money to compensate plaintiffs as either the cost of repairing the property to make it conform to the condition it would have without the defects or as the difference between the value the property would have had at the time of sale if the defects did not exist and the value the property actually had at the time of sale with the defects. (See *Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133.) The jury chose the latter.

However, we think the jury was unjustified in fixing the value of the property at the time of sale at $228,000 rather than the sale price of $207,500. For the jury to use the $228,000 figure in measuring damages was tantamount to bestowing a windfall on plaintiffs. (*Bachewicz v. American National Bank & Trust Co.* (1984), 126 Ill. App. 3d 298, 310, 466 N.E.2d 1096.) Such unjust enrichment is not the intent of giving plaintiffs "the benefit of their bargain." (See *Kinsey v. Scott* (1984), 124 Ill. App. 3d 329, 341, 463 N.E.2d 1359, 1367; *Anderson v. Long Grove Country Club Estates* (1969), 111 Ill. App. 2d 127, 249 N.E.2d 343.) Accordingly, we vacate that portion of the jury's verdict awarding $43,000 to plaintiffs and reduce damages to $22,500, the difference between the purchase price of the property without the flooding defect and the market value of the property with the defect.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed as to Philip Verdung with a modification of damages in accordance with this opinion; judgment as to Richard Bartelt and Baird & Warner is reversed.

Affirmed in part; reversed in part.

NASH, P.J., and STROUSE, J., concur.