CNC SERVICE CENTER, INC., a Wisconsin corporation, Plaintiff,

v.

CNC SERVICE CENTER, INC., an Illinois corporation, Ben Evenson and Bank of Elmhurst, an Illinois banking corporation, Defendants.

BANK OF ELMHURST, Counterplaintiff,

v.

CNC SERVICE CENTER, INC., a Wisconsin corporation, Counterdefendant.

No. 88 C 6941.

United States District Court, N.D. Illinois, E.D.

Jan. 31, 1990.

Merle L. Royce and Marshall J. Burt, Law Offices of Merle L. Royce, Chicago, Ill., for plaintiff and counterdefendant.

Michael A. Cotteleer, Michael A. Cotteleer & Associates, Wheaton, Ill., for defendants and counterplaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This contract action arises from a sale of a business gone awry. Wisconsin corporation CNC Service Center, Inc. ("CNC–Wisconsin") has sued Illinois corporation CNC Service Center, Inc. ("CNC–Illinois"), CNC–Illinois' sole shareholder Ben Evenson ("Evenson") and Bank of Elmhurst ("Bank"), holder of a security interest in personal property once belonging to CNC–

Illinois and transferred by it to CNC–Wisconsin. Three counts in CNC–Wisconsin's four-count Complaint rely on the following grounds to seek (1) rescission of the October 1, 1987 Asset Purchase Agreement ("Agreement") between CNC–Wisconsin and CNC–Illinois and (2) damages from CNC–Illinois and Evenson:

1. Count I alleges that CNC–Illinois breached its warranty of good title to the assets conveyed under the Agreement because some of those assets had previously been pledged to Bank to secure a $50,000 loan.

2. Count II sounds in common law fraud, charging that CNC–Illinois and Evenson made a host of misrepresentations that induced CNC–Wisconsin to enter into the Agreement

3. Count III alleges that Evenson breached the anti-competition clause of the employment contract with CNC–Wisconsin that Evenson entered into as part of the sale-of-business transaction.[1]

CNC–Illinois and Evenson (collectively "Sellers") moved to dismiss the Complaint and requested sanctions against CNC–Wisconsin. Sellers supported their motion with material outside of the pleadings, and this Court's colleague Honorable James Alesia[2] therefore ordered (1) that the motion be treated as a Fed.R.Civ.P. ("Rule") 56 summary judgment motion and (2) that the parties file statements under this District Court's General Rule ("GR") 12(*l*) and 12(m). After briefing was completed on Sellers' summary judgment motion, CNC–Wisconsin filed a cross-motion for summary judgment on its Count I breach-of-warranty-of-title claim.

On February 24, 1989 Judge Alesia referred this action to Magistrate Bernard Weisberg's calendar, instructing the Magistrate to file a report and recommendation on disposition of the cross-motions for summary judgment. While the motions were under consideration by the Magistrate, Judge Alesia disqualified himself from the case and it was reassigned at random to this Court's calendar. On September 26, 1989 Magistrate Weisberg filed his Report and Recommendation (the "Report") and returned the case to this Court for further proceedings.

CNC–Wisconsin and Sellers then filed written objections to the Report within the ten-day period provided by 28 U.S.C. § 636(b)(1) ("Section 636(b)(1)"), and each side responded to the other's objections. Because neither side is content with the Report—objections have been made by one litigant or the other to each of its findings—this Court has now resolved all the issues de novo pursuant to Section 636(b)(1):

1. It determines that the Magistrate's findings as to Counts I and III are unobjectionable. Consequently Sellers' motion for summary judgment on both those counts is denied. CNC–Wisconsin's cross-motion for summary judgment on Count I is granted as to liability, but the question of the appropriate remedy requires more attention than summary adjudication can provide.

2. As for Count II's fraud claim, this Court holds that the Magistrate erred in finding that as a matter of law the "as is" clause in the contract prevented CNC–Wisconsin from reasonably relying on certain alleged misrepresentations that would otherwise be barred by that provision. This Court consequently declines to adopt the Magistrate's recommendations as to that claim. Instead Sellers' summary judgment motion is denied. However, in partial accord with the Magistrate's recommendation this

---

**1.** Count IV, captioned "Interpleader," is not in issue on the current motions. It seeks (1) to enjoin Bank from enforcing its security interest in the assets until the parties' rights have been determined and (2) to require CNC–Illinois to indemnify CNC–Wisconsin against any loss it may sustain as a result of Bank's claim. Bank has answered the Complaint and counterclaimed against CNC–Wisconsin for possession of the assets subject to its security interest or, alternatively, to recover the value of those assets. Under the terms of an agreed order of December 7, 1988, the assets securing the loan were to be sold for Bank's benefit or delivered to Bank.

**2.** Originally this action was assigned to Judge Alesia's calendar.

Court determines pursuant to Rule 56(d) that there is no substantial controversy as to the unreasonableness of CNC–Wisconsin's reliance on the claimed representations alleged in Complaint ¶¶ 36(k), (*l*), (m), (n) and (*o*).

### Facts [3]

In April 1987 Jacques Hopkins ("Hopkins"), now the principal of CNC–Wisconsin, approached Evenson and inquired about purchasing the business of CNC–Illinois. CNC–Illinois was engaged in the business of repairing, servicing and distributing punch presses, other machinery parts and a system for retooling industrial tools. Hopkins was in the process of acquiring other related businesses that he felt would work well in conjunction with CNC–Illinois.

Negotiations resulted in the signing of a detailed Letter of Intent on August 21, 1987. Hopkins and his partner James Cote ("Cote") signed the letter on behalf of a corporation being formed to purchase the assets or stock of CNC–Illinois (CNC–Wisconsin), and Evenson signed on behalf of himself and CNC–Illinois.

After CNC–Wisconsin had been duly formed under the laws of Wisconsin, its counsel Robert Acri drafted the Agreement. On October 1, 1987 both CNC–Illinois and CNC–Wisconsin executed the Agreement. In accordance with its terms, Evenson contemporaneously entered into an employment contract with CNC–Wisconsin by which he became a vice-president and shareholder of CNC–Wisconsin and under which he committed himself to a covenant not to compete.

After the closing under the Agreement, CNC–Wisconsin moved the assets newly purchased from CNC–Illinois to Milwaukee and set up a new business there. In the course of getting the business going, Hopkins discovered certain problems with the just acquired assets of CNC–Illinois and,

believing himself to have received substantially less than he had bargained for under the Agreement, he instituted this lawsuit on behalf of CNC–Wisconsin seeking rescission of the Agreement and damages.

### Magistrate Weisberg's Report
### Count I: CNC–Illinois' Breach of Warranty of Title

■ After logically separating out the two distinct issues that arise under this claim—(a) whether CNC–Wisconsin assumed the underlying bank debt and (b) the effect of CNC–Illinois' promise to sell its assets free and clear of any liens, including Bank's blanket security interest—the Magistrate found:

1. that the Agreement clearly and unambiguously warranted that Sellers would deliver the assets "free and clear of all liens, pledges, charges, claims and encumbrances" (Agreement ¶ 3.3) and

2. that Sellers' failure to make such free-and-clear delivery was not waived by CNC–Wisconsin's later conduct.

Interestingly enough, Sellers object to the Report solely on the latter issue of waiver and not on any claimed absence of breach. Because this Court agrees with the substance of the Magistrate's reasoning on this count, this opinion will deal only briefly with a few points that bear emphasis or clarification.

First, a determination that CNC–Wisconsin did assume the $50,000 Bank loan is of course a necessary first step, for a negative answer to that question would obviate the need for further discussion. If CNC–Wisconsin had not assumed that debt, no colorable argument could have been made (in the face of the unambiguous contract language to the contrary) that it had agreed to *secure* a debt from which it would derive no benefit whatsoever. But the converse of that statement is not neces-

---

3. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—(*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Where as here cross motions are involved, that principle demands a dual perspective that sometimes causes the denial of both motions.

sarily true. In the words of the Magistrate (Report at 11):

> CNC–Wisconsin's agreement to assume the loan does not absolve CNC–Illinois of possible liability under Count I.[4]

Indeed it does not. Paragraph 3.3 of the Agreement—a document that by its own terms contains the entire agreement between the parties [5]—states this flat-out representation and warranty:

> *Title.* Seller has good and marketable title to all the Assets which it will sell to Purchaser, free and clear of all liens, pledges, charges, claims and encumbrances.

No ambiguity is hidden in that perfectly transparent language, and none can be created by reference to parol evidence in the form of opaque provisions in earlier documents.[6]

Magistrate Weisberg also correctly noted that Sellers' attempted reliance on the teaching of *Rockdale Cable T.V. Co. v. Spadora,* 97 Ill.App.3d 754, 53 Ill.Dec. 171, 423 N.E.2d 555 (3d Dist.1981) cannot change that result. In this Court's view, however, that conclusion flows from the distinguishable facts of the case at bar and *not* because either this Court or the Magistrate is free to decline to follow the *Rockdale* holding.

■ This Court is of course aware of the language in many cases (including a number from our Court of Appeals as well as from some of this Court's colleagues [7]) that describes the task of a federal court in diversity cases as one of engaging in Illinois–Supreme–Court–prediction. But in that respect our Court of Appeals has never yet been called upon to treat with the principles explicated in a number of this Court's opinions (see, e.g., the Appendix to the opinion in *Rizzo v. Means Services, Inc.,* 632 F.Supp. 1115, 1131 (N.D.Ill.1986) and cases cited there). Unless and until the Court of Appeals is thus confronted with the issue and, having done so, still adheres to the predictive approach, this Court will continue to regard faithfulness to *Erie v. Tompkins'* teaching as demanding the federal courts' adherence to modern decisions from the Illinois Appellate Court that have not been undercut by contrary signals from the Illinois Supreme Court. After all, when sitting in diversity a federal court is duty-bound to adhere to the substantive state law rules that govern the decision. Under those substantive rules an Illinois trial court is not free to decline to follow the holding of an intermediate appellate case handed down anywhere in the state. That being true, no federal trial court sitting in the stead of a corre-

4. [Footnote by this Court] Sellers urge that while that conclusion might be true in theory, it rests on a faulty assumption that CNC–Wisconsin wished to acquire unencumbered assets in order to obtain further financing on the security of those assets. Sellers make a futile attempt to undercut that assumption by pointing to the fact that CNC–Wisconsin executed promissory notes in Sellers' favor in connection with the sale of assets, thereby encumbering the assets of their own volition. But that argument is thoughtlessly advanced, for it hurts Sellers' cause more than it helps it. On their face, both those promissory notes (D.Obj.Exs. A and B) grant a *subordinated* security interest in the assets. That subordination language plainly tends to support Magistrate Weisberg's view that CNC–Wisconsin specifically contemplated the right to engage in *further* borrowing as against those assets.

5. Agreement ¶ 11.4 provides:

> *Entire Agreement.* This instrument, and the exhibits referred to herein, contain the entire agreement between the parties hereto with respect to the transaction contemplated herein and supersede all previous written or oral negotiations, commitments and writings.

6. Sellers attempt to avoid the obligation they undertook unequivocally via Agreement ¶ 3.3 by pointing to Paragraph 9.11 of the Letter of Intent, which states as a contingency of the proposed purchase (emphasis added):

> Buyer being able to assume Seller/Company line of credit/overdaraft [sic] on *current terms* without pledge of *additional collateral.*

It is a full answer to that argument that the Agreement is unambiguous and supersedes the Letter of Intent. While a litigant may use parol evidence to show the intent of the parties where the contract itself is ambiguous, the litigant may not use parol evidence to create an ambiguity in a document that is otherwise clear on its face.

7. Among the judges on this District Court who have addressed the issue rather than merely announcing an unexamined rule, there is a split of opinion.

sponding state court should be free to do otherwise.

While the *Rizzo* discussion focuses directly on the obligation of a federal court to apply the rule of the Illinois Appellate Court for the relevant geographical Appellate District where there is a split of authority among the Appellate Courts for different districts, the same rationale has at least equal force where no such conflict exists. *People v. Thorpe*, 52 Ill.App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist.1977) articulates the well-established Illinois rule that "decisions of an appellate court are binding precedent on all circuits regardless of locale." That rule does not allow for an Illinois trial court to decline to follow such a precedent when it believes that precedent to be wrongly decided, and *Erie* dictates that a federal court must be equally restrained in its application of the law. Of course the Illinois–Supreme–Court–prediction approach has a proper place in some situations calling for application of state law,[8] but when an intermediate appellate court has recently spoken on an area of substantive law and there is no contrary signal from the Supreme Court, any lower court—be it a state court or a federal court sitting in diversity—is bound to adhere to that proclamation.

Thus the *Rockdale* holding is fully binding on this Court. However, as Magistrate Weisberg found (Report at 13–14), two vital differences distinguish the instant case from *Rockdale* and call for a contrary result. First, the *Rockdale* court found that the written contract before it did *not* constitute the complete agreement between the parties, so that the parol evidence rule therefore did not bar consideration of extrinsic evidence. In so doing, *Rockdale* specifically confirmed the bar created by the integrated-writing doctrine and went on to consider extrinsic evidence only after it had examined the contract and held it was *not* "a complete and exclusive statement of the parties' agreement." Second, the ex-

trinsic evidence in that case showed actual knowledge on the part of the buyer, before execution of the purchase agreement, that the seller had already transferred full title to the assets in question to a third party, so that by definition those assets could not form part of the package for which the buyer had bargained.

Here, conversely, the written contract *did* constitute the complete agreement (see n. 5), and the parol evidence rule therefore has its full preclusive effect. That alone is dispositive as to the inapplicability of *Rockdale* to control this case. It may also be observed parenthetically, however, that even if extrinsic evidence could be taken into account here (as it may not), the situation in this case is very different from that in *Rockdale*. Even if CNC–Wisconsin had actual notice of Bank's lien—a question hotly disputed by the parties—that alone would not show that the bargain they struck was for the *encumbered* assets. Sellers were free to take action in any one of a number of ways to free the assets from the encumbrance before closing the transaction (thus rendering their Agreement ¶ 3.3 warranty a truthful one). Hence nothing in the fact of the encumbrance's existence, or even in CNC–Wisconsin's claimed knowledge on that score, vitiates the literal terms of the parties' bargain calling for assets free and clear. By sharp contrast, the facts in *Rockdale* did not allow for any conclusion other than that the contract there excluded the assets in question.

Having correctly determined that Sellers breached their express warranty of title, Magistrate Weisberg found that CNC–Wisconsin did not waive its rights against Sellers for breach of the warranty. Sellers strenuously object to that conclusion, bottoming their argument on two facts:

1. CNC–Wisconsin did not seek confirmation that the assets were unencumbered at the time of closing.

---

**8.** For instance, where a novel state law question is presented and there is no controlling state precedent a state trial court must try to predict what its Supreme Court would do if faced with the same problem. That then likewise becomes the task of its federal trial court counterpart in a diversity case.

2. CNC–Wisconsin dealt cooperatively with Bank regarding servicing of the debt following the closing.[9]

On that score the Magistrate's reasoning and conclusions could not have been more on target. Each of Sellers' contentions can be dealt with in brief compass. Both are governed by the basic principle (see, e.g., *Life Savings and Loan Association of America v. Palos Bank and Trust Co.*, 155 Ill.App.3d 748, 753, 108 Ill.Dec. 101, 105, 508 N.E.2d 262, 266 (1st Dist.1987), quoting *Kane v. American National Bank & Trust Co.*, 21 Ill.App.3d 1046, 1052, 316 N.E.2d 177, 182 (2d Dist.1974)) that there must be a "clear, unequivocal and decisive act" to imply the waiver of a legal right.

■ As to Sellers' first argument, surely CNC–Wisconsin's failure to ask for confirmation from CNC–Illinois that it was delivering what it was already contractually obligated to provide does not amount to a relinquishment of CNC–Wisconsin's right to get its due under the Agreement or, in the alternative, to sue for breach. This was the sale of an entire business, not of just the assets now in dispute. There is no legal requirement that a closing checklist must contain a request for verification of the preexisting warranties and representations. Hindsight does not dictate the standard for a buyer's conduct at the closing of a business purchase, and hindsight cannot impute a waiver to CNC–Wisconsin's conduct here.

■ For their second argument, Sellers rely on the fact that Hopkins signed UCC financing statements at Bank's request after the closing. Sellers read that as evidencing CNC–Wisconsin's intention to proceed with the purchase transaction even after it learned of the existing lien.[10] True enough, that *might* suggest that CNC–Wis-

consin, in the face of a blatant violation of contract, chose to look the other way (in turn suggesting that it might not have viewed the breach as material). But that is not the only (or even the most plausible) conclusion that could be drawn from CNC–Wisconsin's behavior. Its conduct is at least equally susceptible to the reading that the Magistrate attributed to it—that it was a commercially reasonable attempt to avoid immediate litigation with Bank (Report 16–17). This Court need not place those alternatives into the balance to see which is a more likely explanation. If each is plausible, then by definition CNC–Wisconsin's conduct was not a "clear, unequivocal and decisive" waiver—the Illinois legal standard for an implied waiver.

In sum, Sellers violated their express warranty of title by delivering assets impermissibly encumbered by a blanket bank lien, and they have failed to show that CNC–Wisconsin waived its rights to object to that breach. This Court therefore adopts the Report in that respect, finds there is no genuine issue of material fact and grants CNC–Wisconsin's motion for summary judgment on Count I.

### Count II: Fraud in the Inducement

Count II sets out a detailed list of misrepresentations by Evenson that CNC–Wisconsin claims induced it to enter into the Agreement. That list covers a wide range, touching on the condition and title of the assets, the competence and experience of Evenson and other employees, the business reputation and relationships of CNC–Illinois and the design and value of the "Cosmos" control panel allegedly developed by CNC–Illinois. Sellers maintain that none of those matters can properly be considered because they either (1) have no foundation in the language of the Agree-

9. Sellers advance several contentions under the heading of "waiver" that actually go to the existence and scope of the warranty in the first instance. Those include the impact of *Rockdale*, the interpretation of the purchase agreement in light of extrinsic evidence and the assumption of the underlying debt by CNC–Wisconsin. All those issues have already been addressed in the context in which they are relevant. Thus the following discussion of the

waiver question will focus only on issues of direct relevance—the conduct of the nonbreaching party after it became aware of the breach.

10. Precisely when CNC–Wisconsin learned of the encumbrances is disputed by the parties. But there can be no doubt that it could have (and should have) learned of the existing lien by reading the UCC forms sent to it by Bank.

ment or (2) were expressly disclaimed by the Agreement itself.

Before this opinion turns to the substance of CNC–Wisconsin's fraud claim, a procedural issue requires consideration. Report n. 11 said this:

> We also note that there does not appear to be anything in the record to support these particular allegations of misrepresentation. Normally the party having the burden of proof on an issue must produce some evidence to avoid summary judgment. *Celotex Corp. v. Catrett*, 497 U.S. 317, 322–23 [106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265] (1966) [sic—should be 477 U.S. and the year should be 1986]. However it is incumbent upon the moving party to point out the absence of evidence to permit the non-moving party to submit evidentiary material or move for additional discovery under Rule 56(f). Since Sellers have not done so, summary judgment on these claims would be improper.[11]

Sellers' written objections (D.Obj.12) call on this Court to disavow that ruling. But their position must be rejected, for the time for them to have pointed to CNC–Wisconsin's absence of evidentiary support was at the time Sellers moved for summary judgment—not now, when their opponent can do nothing to remedy that absence.

■ Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53). When the nonmovant has the ultimate burden on a particular fact, the party moving for summary judgment may simply point to the absence of evidence from which that fact may reasonably be inferred, and then the nonmovant must

come forward with evidence on that point—it cannot simply rest on its pleadings (*id.* at 323, 106 S.Ct. at 2553). But those principles do not help Sellers here. To be sure, CNC–Wisconsin has the burden of proof on the allegations of misrepresentation and deceit that make up its fraud claim. But Sellers' total failure to have denied those allegations, or (until the most recent filings) even to point out CNC–Wisconsin's lack of evidence to prove those claims, bars Sellers from getting summary judgment on that ground.

■ Sellers' motion for summary judgment[12] on Count II, and its corresponding GR 12(*l*) Statement, discussed only the preclusive effect of the Agreement's disclaimer language on the alleged fraud—not the absence of evidence to support the alleged misstatements. In that light it is perfectly understandable that CNC–Wisconsin's responsive summary judgment papers as to Count II were limited to arguments as to the legal impact of the same disclaimer language, without advancing Rule 56(e) evidence to support the individual allegations.

In such circumstances it would be totally inappropriate to grant Sellers' summary judgment motion on that basis. CNC–Wisconsin should not lose its day in court because it failed to provide evidentiary support for facts that the movants never suggested were lacking in adequate foundation. And that conclusion is buttressed by the fact that Sellers, due to the peculiar procedural posture of this case, never answered the Complaint and thus never denied the allegations of Complaint ¶ 36. That makes CNC–Wisconsin's failure to offer evidence on those allegations even more understandable—why should it have provided evidence to support propositions that

---

**11.** [Footnote by this Court] Magistrate Weisberg's term "these particular allegations" referred only to those contained in Complaint ¶¶ 36(b), (c) and (d) (the only allegations on which he did not recommend the granting of summary judgment). However, the analysis that follows in the text applies to everything that CNC–Wisconsin asserts in Complaint ¶ 36 but *does not buttress with evidentiary support.*

**12.** As explained at the outset of this opinion, Sellers originally filed a motion to dismiss,

which Judge Alesia then directed the parties to convert to a motion for summary judgment. That undoubtedly explains why Sellers' submissions were limited in the way described in this sentence of the text, rather than attacking the lack of evidentiary support for the underlying allegations. But it also explains why CNC–Wisconsin was justified in following Sellers' lead and addressing only the issues that had been dealt with by Sellers.

had not been put into dispute? In sum, while Rule 56(e) requires a nonmovant to offer evidence and not to rely on its pleadings, the Rule also provides that failure to do so will result in an adverse summary judgment only where "appropriate."[13] As the Magistrate correctly noted, such a judgment is not appropriate in the circumstances of this case.

▆▆▆ It is time to turn, then, to the substance of Count II.[14] At the outset of his treatment of that count, Magistrate Weisberg correctly observed that it alleges fraud in the inducement—a fraud that, if proved, would invalidate the contract.[15] That being the case, he determined (Report 18–21), on the authority of this Court's opinion in *Caliber Partners, Ltd. v. Affeld,* 583 F.Supp. 1308, 1311–12 (N.D.Ill.1984), that misrepresentations as to matters outside the scope of the written Agreement and contrary to its terms may be considered in evaluating a fraud claim that may ultimately void the written contract altogether. Because the presence of fraud in the inducement means that there is no valid contract subject to the parol evidence rule, that in turn gives the court full freedom to consider all the evidence (including parol evidence) offered to show fraud. To that extent the Magistrate correctly stated and applied the law.

▆▆▆ Having made that determination, however, the Magistrate then concluded that "although such representations may be considered, the court doubts that they can survive an express disclaimer in the written contract to the extent they fall within it" (Report 18). Because Magistrate

Weisberg found that CNC–Wisconsin as a matter of law cannot show that it reasonably relied on statements that were directly controverted by the language of the Agreement, he recommended a determination pursuant to Rule 56(d) that no substantial controversy exists as to the unreasonableness of CNC–Wisconsin's reliance on those representations covered by the disclaimer.

Toward that end Magistrate Weisberg relied on *Hurley v. Frontier Ford Motors, Inc.,* 12 Ill.App.3d 905, 299 N.E.2d 387 (2d Dist.1973) and *American Savings Association v. Conrath,* 123 Ill.App.3d 140, 78 Ill.Dec. 730, 462 N.E.2d 849 (5th Dist.1984) as establishing that no one is generally justified in relying on representations outside of or contrary to the contract he or she signs where the signer is aware of the nature of the contract and had a full opportunity to read the contract. Those cases do not hold that such reliance is *never* justified—they rather state that "[b]ecause the term 'as is' is easily understandable ..., it may be appropriate to require very convincing proof of fraud before relief will be granted" (*Hurley,* 12 Ill.App.3d at 911, 299 N.E.2d at 392) and that such reliance will be deemed reasonable only "in circumstances indicating manifest inequality between the respective parties" (*American Savings,* 123 Ill.App.3d at 146, 78 Ill.Dec. at 735, 462 N.E.2d at 854). Because Magistrate Weisberg felt that "under the circumstance here the burden faced by an experienced businessman assisted by an attorney who drafted the contract is insurmountable," he found Sellers entitled to summary judg-

---

**13.** Rule 56(e) provides in relevant part (emphasis added):

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth the specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, *if appropriate,* shall be entered against the adverse party.

**14.** For the just-described reason, the discussion that follows will speak only of CNC–Wisconsin's

Complaint ¶ 36 allegations, not of any evidentiary proof supporting them.

**15.** *Ainsworth Corp. v. Cenco Inc.,* 107 Ill.App.3d 435, 439, 63 Ill.Dec. 168, 172, 437 N.E.2d 817, 821 (1st Dist.1982) (citation omitted) says:

In order to constitute "fraud invalidating a contract" a representation (1) must be one of material fact which has been made for the purpose of inducing the other party to act, (2) must be known to be false to the maker, but reasonably believed to be true by the other party, and (3) must be relied upon by the other party and acted upon to his damage.

ment as to those allegations disclaimed by the Agreement.

CNC–Wisconsin lodges an objection to that conclusion, and this Court must agree. True enough, Agreement ¶ 5 states:

Purchaser acknowledges that it has inspected all of the Assets to its satisfaction and that it is fully satisfied with the condition of the Assets. Purchaser further acknowledges that the Assets are being sold hereunder AS IS AND WHERE IS WITHOUT ANY WARRANTY OR REPRESENTATION, EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION ANY WARRANTY OR REPRESENTATION AS TO CONDITION, DESIGN, OPERATION, FITNESS FOR USE OR MERCHANTABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE. Possession of the Assets shall be given to purchaser on the Closing Date.

But the crux of CNC–Wisconsin's claim is that it *believed* that it had inspected the assets and confirmed all of Sellers' material representations, but that it had not *in fact* because Sellers had concealed material facts that rendered all the independent investigation meaningless. In such a circumstance, the party is not alerted to the alleged fraud simply by reading the terms of the document. And that renders inapplicable the usual rule that when oral and written representations conflict, the writing will govern.

That concept may be best illustrated by contrasting the situation in *Hurley*. There the buyer entered into negotiations to purchase a used automobile. In the course of those negotiations an agent of the seller allegedly told the buyer that he would throw in all repairs on the car as part of the deal. When the buyer ultimately decided to take the automobile, she signed a contract that on its face said that the car was being sold "as is" and nowhere mentioned anything as to repairs. Because the buyer thus signed a contract that expressly contradicted the seller's oral representations, the buyer could not reasonably rely on those earlier oral statements. That result turns on the fact that the buyer could

have (and should have) noted the discrepancy when reading the agreement and then resolved the problem before she signed.

In like manner, the finding of lack of reasonable reliance in *American Savings* turned on the fact that the complaining party could have discovered the fraud by reading the written document and was provided ample opportunity to do so. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988) explained the rationale behind that rule (albeit in the context of securities rather than contract fraud):

Just as in the law of contracts a written declaration informing one party of an important fact dominates a contrary oral declaration, so in the law of securities a written disclosure trumps an inconsistent oral statement. Otherwise even the most careful seller is at risk, for it is easy to claim: "Despite what the written documents say, one of your agents told me something else." If such a claim of oral inconsistency were enough, sellers' risk would be greatly enlarged. All buyers would have to pay a risk premium to cover this extra cost of doing business.

Thus the rule reflects that if a contracting party is put on notice by the specific terms of the contract that there is reason to doubt the veracity of an inconsistent oral statement, the party cannot later assert reasonable reliance on that oral statement.

But this case is not as simple as that. CNC–Wisconsin's fundamental claim is that its opportunity to inspect was directly frustrated by Sellers' conduct. Specifically Complaint ¶ 36(a) alleges that when Hopkins and Cote inspected the "Cosmos" control panel it had been "jerryrigged and wired" to appear operational even when it was not. Nothing in the written agreement could have put CNC–Wisconsin on notice of the fact that the Sellers had actively concealed the nature of the asset (as is alleged). Illinois courts have recognized that concealment by its very nature stands as a roadblock to notice. Thus *Russow v. Bobola*, 2 Ill.App.3d 837, 277 N.E.2d 769 (2d Dist.1972) upheld a fraud claim based on allegations that a homeowner, seeking

to hide from his prospective buyer the evidence of water damage resulting from a chronic leakage problem, repainted his basement. As *Russow*, 2 Ill.App.3d at 842, 277 N.E.2d at 772 (citations omitted) put it:

> While it is true that the plaintiffs had a duty of inquiry regarding the premises and are chargeable with all knowledge which an examination conducted with ordinary care would provide, the matter undisclosed here is of such a nature that it would not be readily apparent from an inspection of the property.

Complaint ¶¶ 36(e) and (j) allege that Sellers represented they had certain contracts of importance to CNC–Wisconsin. CNC–Wisconsin says it independently verified the existence of those contracts, but between the time of verification and the signing of the Agreement Sellers cancelled the contracts without notifying CNC–Wisconsin. That kind of deliberate concealment of a material fact can provide the basis for a fraud action. *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 180, 92 Ill.Dec. 809, 816–17, 485 N.E.2d 855, 862–63 (2d Dist.1985) (citations omitted) explained:

> While silence in a business transaction does not necessarily amount to fraud, silence accompanied by deceptive conduct or suppression of material facts results in active concealment.... In such a case, if a party to a contract of sale does not disclose the whole truth, having the requisite intent to deceive, this amounts to fraud equal to an affirmative falsehood.

Again even the closest reading of the Agreement would not have revealed the alleged fraud.

 In circumstances such as these, where the fraud complained of is active concealment of a material fact, the existence of a disclaimer in the contract does not really amount to a statement contrary to the fraudulent statement so as to put the victim on notice of the fraud. This Court cannot say as a matter of law that CNC–Wisconsin was unreasonable in relying on its own (and presumably non-negligent) investigation in deciding to enter into the Agreement. In a sense CNC–Wisconsin is helped rather than hurt by the Agreement's "as is" provision. As *United States v. Blake*, 161 F.Supp. 76, 80–81 (E.D.N.C.1958) says:

> Where property is sold on an "as is—where is" basis, and the seller urges and recommends that the prospective purchaser inspect it, it being within the sole dominion of the seller and available for inspection only with his acquiescence, it is the opinion of this Court that the seller in accepting an offer based on such inspection, impliedly warrants that the property sold will not substantially and materially differ in character from the property inspected except where such difference results from qualities inherent in the property at the time of inspection, the seller impliedly warrants that the property delivered under the later formed contract will be "as is" or more accurately "as was" at the time of inspection.

Here CNC–Wisconsin alleges that Sellers' fraudulent concealment resulted in delivery of assets materially different from those inspected. In that situation the factfinder must determine whether, in light of all the circumstances, it was reasonable for the complainant to rely on the way things appeared to it at the time of inspection or whether, because of the nature of the contract and the assets, the buyer was acting at its own peril. For that reason Magistrate Weisberg's recommendation to grant summary judgment on the issues contained in Complaint ¶¶ 36(a), (e) and (j) is not adopted.

CNC–Wisconsin also objected to the Magistrate's Rule 56(d) summary judgment recommendation as to the issues raised by Complaint ¶¶ 36(f) and (g)[16] but did not object to the parallel recommendation on Complaint ¶¶ 36(k), (*l*), (m), (n) and (*o*). That reflects CNC–Wisconsin's perception that the latter group were oral misrepre-

---

**16.** Those subparagraphs alleged (1) that CNC–Illinois had represented that it (a) had developed and designed the "Cosmos" control panel and the software that went with it and (b) had experience installing such equipment and (2) that those statements were untrue.

sentations controverted by the Agreement's disclaimer, and thus falling within the general rule discussed above, while the first two were assertions as to the goodwill of the business and its operation as an ongoing concern that were not disclaimed by the Agreement. To the extent that the first two paragraphs touch on CNC–Illinois' experience and position in the relevant business community, they implicate intangible assets that formed part of the Agreement.[17] And because the Agreement contained no disclaimer in that respect, there is indeed a genuine issue of material fact as to whether CNC–Wisconsin's reliance on the statements was reasonable.

█ Finally, Sellers object to the Magistrate's failure to recommend summary judgment on the issues raised by the allegations in Complaint ¶¶ 36(b), (c), and (d),[18] claiming that those allegations relate to an asset that was not a part of the transaction: the company's goodwill. That contention cannot survive scrutiny. This was not a situation in which one company bought another's assets to convert to some new use or to integrate into the buyer's ongoing business carried on under a different name. Here the Agreement provided for the sale of all of CNC–Illinois' assets, including its customer lists and its name—functionally the sale of an ongoing business, of which goodwill is an integral part. Under such circumstances Sellers' claim that the Agreement contemplated only the sale of tangible assets is not credible, and this Court adopts Magistrate Weisberg's recommendation to deny summary judgment as to those matters.

## Count III: Evenson's Breach of Employment Contract

█ Sellers object to Magistrate Weisberg's conclusion that Evenson engaged in competition prohibited by his employment contract[19] when he sought to obtain a position with Machinery Systems International ("MSI") to organize a service department for that company—at the very same time that CNC–Wisconsin was negotiating the sale of its service department to the same company.[20] Magistrate Weisberg's reasoning and conclusion of that issue were unexceptionable. Sellers cannot avoid the impact of the Magistrate's conclusion by urging that MSI's non-hiring of Evenson prohibits a finding of competition on his part.

17. See the discussion in the next paragraph of the text.

18. Those subparagraphs relate to CNC–Illinois' reputation and experience in the retrofitting business and to Evenson's skill and experience.

19. Paragraph 7 of the Employment Agreement provides (reproduced verbatim—poor spelling, poor punctuation, poor English, poor proofreading, poor sentence structure and all):

Competitive Activities. Employee shall not, within the geographic area of The States of Wisconsin and Illinois; and any customers which Company has done business or had contract with, during the period of his employment and for a period of his employment and for a period of two (2) years after the termination of Employee's period employment with Company, including, without limitation, termination for cause, voluntary termination for cause, voluntary termination or due to the natural termination of this agreement:

(a) Directly or indirectly compete in any manner whatsoever with Company:

(b) Directly or indirectly own, manage, operate, control, be employed by, participate in or be connected in any manner with the ownership, management, operation or control of any business similar to the type of business similar to the type of business conducted by the Company, at the time of the termination of this agreement; or

(c) Violate the provisions set forth in Exhibit B, attached hereto and made a part hereof.

(d) Employee agrees that this Section 7 are reasonable and necessary covenants to protect the Company from damaging competition by a former employee. In addition, Employee will be receiving ten thousand dollars per year which represents consideration for the covenants contained herein. The existence of any claim or cause of action of Employee against Company, whether based in this agreement or not, shall not constitute a defense to the enforcement by Company of any term or provision set forth in this agreement, The termination of Employee's employment with the Company, including, without limitation, termination or due to the natural termination of this agreement, shall in no way constitute a defense or relieve Employee of the obligation to observe the terms and provisions set forth in this agreement.

20. As with Count II, this section accepts CNC–Wisconsin's allegations as correct.

To *compete* does not necessarily mean to *win*—Evenson certainly broke his promise if the Complaint speaks the truth, and Sellers' contention goes to the question of damages rather than to the cause of action itself.

*Conclusion*

This Court adopts Magistrate Weisberg's recommendations as to Counts I and III:

1. There is no genuine issue of material fact as to CNC–Illinois' breach of its warranty of title and the absence of waiver of that breach by CNC–Wisconsin. CNC–Wisconsin's motion for summary judgment as to liability on Count I is therefore granted, but the issue of the appropriate remedy is reserved for later determination. Sellers' motion for summary judgment on Count I is of course denied.

2. There is also no genuine issue of material fact—at least at this stage—as to Evenson's breach of his non-competition covenant. Accordingly Sellers' motion for summary judgment on Count III is denied.

As for Count II, Sellers' motion for total summary judgment is denied. However, there is no genuine issue of material fact regarding the unreasonableness of CNC–Wisconsin's reliance on the misrepresentations alleged in Complaint ¶¶ 36(k), (*l*), (m), (n) and (o). Those subparagraphs are therefore stricken.

Because Sellers have never answered the Complaint, they are ordered to do so on or before February 15, 1990. This action is set for a status hearing at 9 a.m. February 22, 1990.